## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>325 7th Street, N.W., Suite 300<br>Washington, DC 20530,<br><br>        Plaintiff,<br><br>      v.<br><br>**BAIN CAPITAL, LLC**<br>111 Huntington Ave.<br>Boston, MA 02199,<br><br>and<br><br>**THOMAS H. LEE PARTNERS, L.P.**<br>100 Federal St. 35th Fl.<br>Boston, MA 02110,<br><br>and<br><br>**CLEAR CHANNEL**<br>**COMMUNICATIONS, INC.**<br>200 E. Basse Rd.<br>San Antonio, TX 78209,<br><br>        Defendants. | Civil Action No.<br><br>Filed: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the proposed acquisition of Clear Channel Communications Inc. ("Clear Channel") by a private equity group of investors led by Bain Capital, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL"), and to obtain other relief as appropriate. Plaintiff United States alleges as follows:

## I. Nature of the Action

1.      Bain and THL, two of the world's leading private investment firms, are planning to acquire, each through various affiliated funds, substantial ownership interests in Clear Channel, the largest operator of radio stations in the United States (the "transaction"). The anticipated value of the transaction is $28 billion.

2.      After the transaction, Bain and THL each would control at least 35 percent of the voting interests in Clear Channel and each would designate four members to the 12 member Clear Channel Board of Directors. Together, Bain and THL would control at least 70 percent of the voting interests of Clear Channel and designate two-thirds of the members of its Board of Directors. Further, Bain and THL, either directly or indirectly through management teams they install, typically manage and operate the assets in which they invest.

3.      Bain and THL, through affiliated funds and co-investment vehicles, have substantial ownership interests in Cumulus Media Partners LLC ("CMP"), another large nationwide operator of radio stations. Bain and THL each control 25 percent of the voting interests of CMP and designate two members to its eight member Board of Directors. Together, Bain and THL control 50 percent of the voting interests of CMP and designate one-half of the members of its Board of Directors. CMP operates radio stations that compete head-to-head with Clear Channel radio stations in Cincinnati, Ohio and Houston/Galveston, Texas ("Houston").

4.      After the transaction, Bain and THL would have governance rights in Clear Channel and CMP sufficient to enable Bain and THL, individually or together, to control or influence the companies' competitive decisions to produce an anticompetitive outcome in markets where both Clear Channel and CMS are significant competitors. Accordingly, Bain's and THL's

acquisitions of substantial partial ownership interests in Clear Channel would substantially lessen competition between Clear Channel and CMP in the sale of radio advertising in Cincinnati and Houston in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

5. THL, through affiliated funds and co-investment vehicles, currently holds a 20 percent equity interest and a 14 percent voting interest in Univision Communications, Inc. ("Univision"), a large nationwide operator of radio stations that broadcast primarily in Spanish-language format. THL designates three members to Univision's 17 member Board of Directors. Univision operates radio stations that compete head-to-head with Clear Channel's Spanish-language radio stations in Houston; Las Vegas, Nevada; and San Francisco, California.

6. After the transaction, THL would have governance rights in Clear Channel and Univision sufficient to influence the companies' competitive decisions to produce an anticompetitive outcome in markets where both Clear Channel and Univision are significant competitors. Accordingly, THL's acquisition of a substantial partial ownership interest in Clear Channel would substantially lessen competition in the sale of Spanish-language radio advertising in Houston, Las Vegas, and San Francisco in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. Jurisdiction and Venue

7. Plaintiff United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

8. Bain and THL, through CMP and Univision, and Clear Channel sell radio advertising to local and national advertisers, a commercial activity that substantially affects and is

in the flow of interstate commerce. This Court has jurisdiction over the subject matter of this action pursuant to Sections 15 and 16 of the Clayton Act, 15 U.S.C. §§ 25, 26, and 28 U.S.C. §§ 1331, 1337.

9.    Bain, THL, and Clear Channel transact business within the District of Columbia. Venue is therefore proper in this Court pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

### III. Defendants and Other Relevant Entities

10.    Clear Channel is a diversified media company incorporated in Texas and headquartered in San Antonio, Texas. Clear Channel owns various media outlets including radio stations, domestic and international outdoor advertising assets, television stations, and a media representation firm. Radio broadcasting is Clear Channel's largest business segment, representing over 50 percent of Clear Channel's total revenue. As of February 5, 2008, Clear Channel owned 833 radio stations in the United States, 508 of which were located within the top 100 markets as ranked by Arbitron, an international media marketing and research firm, including stations in Cincinnati, Houston, Las Vegas, and San Francisco.

11.    Bain is a Delaware limited liability company headquartered in Boston, Massachusetts. Bain is one of the world's leading private investment firms with over $40 billion in assets under management.

12.    THL is a Delaware limited partnership headquartered in Boston, Massachusetts and also is one of the world's leading private investment firms. THL currently manages approximately $12 billion of committed capital.

-4-

13.    Bain and THL raise pools of capital from private investors, controlling and managing that capital through private equity funds and co-investment vehicles that invest in discrete opportunities, such as venture capital, public equity, and leveraged debt assets.

14.    CMP is a limited liability company formed in 2005 that is owned by Bain, THL, Cumulus Broadcasting Inc., the Blackstone Group, and their affiliates. As of February 5, 2008, CMP owned 34 radio stations in various markets, including Cincinnati and Houston.

15.    Univision is headquartered in New York City and is the largest broadcaster of Spanish-language television programming in the United States. Univision also owns 70 radio stations that broadcast in Spanish language in various markets, including Houston, Las Vegas, and San Francisco. Univision is owned and operated by five private equity firms: THL, Haim Saban, TPG Capital, Providence Equity, Madison Dearborn, and their affiliates.

### IV. The Proposed Acquisition

16.    Clear Channel, Bain, and THL have agreed that funds and co-investment vehicles under the direction of Bain (collectively "Bain CC Affiliates") and funds and co-investment vehicles under the direction of THL (collectively "THL CC Affiliates") will purchase a controlling interest in Clear Channel. Under their proposal, Bain and THL each will acquire at least a 35 percent voting and economic interest in Clear Channel, with the remaining interest of up to 30 percent staying in the hands of those current Clear Channel investors and option-holders who elect to retain an equity interest in Clear Channel rather than to receive cash for their shares and/or stock options. Under the purchase arrangement, Bain and THL, through Bain CC Affiliates and THL CC Affiliates, each will also acquire the right to designate four directors of the 12 member Clear Channel Board of Directors. If the transaction is consummated, Bain and THL

together will control at least 70 percent of the voting interests of Clear Channel and designate two-thirds of the members of the Board of Directors.

## V. Relevant Markets

### A.    *Relevant Product Markets*

17.    *Radio Advertising.* Radio stations employ various formats for their programming, such as Adult Contemporary, Sports, or Rock. A station's format can be important in determining the size and characteristics of its listening audience. Companies that operate radio stations, like Clear Channel, CMP, and Univision, sell advertising time to local and national advertisers in each geographic market where they operate those stations. Advertising rates charged by a radio station are based primarily on the station's ability to attract listening audiences having certain demographic characteristics in the market area that advertisers want to reach, as well as on the number of stations and the relative demand for radio in the market.

18.    Many local and national advertisers purchase radio advertising time because they consider it preferable to advertising in other media to meet their specific needs. They may consider radio advertising time to be more cost-effective than other media to reach their target audiences. They may also consider radio advertising to be more efficient than other media to reach their target audiences. Additionally, radio stations render certain services or promotional opportunities to advertisers that the advertisers cannot exploit as effectively using other media. For these reasons, many local and national advertisers who purchase radio advertising time view radio as a necessary advertising medium, sometimes as a complement to other media. A substantial number of advertisers with strong radio preferences would not turn to other media if faced with a small but significant increase in the price of advertising time on radio stations.

-6-

19.    Radio stations generally can identify advertisers with strong radio preferences. Radio stations also negotiate prices individually with advertisers; consequently, radio stations can charge different advertisers different prices. Because of this ability to price discriminate among customers, radio stations may charge higher prices to the substantial number of advertisers that view radio as particularly effective for their needs, while maintaining lower prices for other advertisers.

20.    In the event of a price increase in radio advertising time, some local and national advertisers may switch some of their advertising to other media rather than absorb a price increase in radio advertising time. However, the existence of such advertisers would not prevent radio stations from profitably raising their prices by a small but significant amount for a substantial number of advertisers that would not switch.

21.    Accordingly, the provision of advertising time on radio stations is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

22.    *Spanish-language Radio Advertising.* In markets with a large Hispanic population, many local and national advertisers also consider Spanish-language radio to be particularly effective or necessary to reach their desired customers, particularly consumers who listen predominantly or exclusively to Spanish-language radio. A substantial number of these advertisers consider Spanish-language radio, either alone or as a complement to other media, to be the most effective way to reach their target audience, and do not consider other media, including non-Spanish-language radio, to be a reasonable substitute. These advertisers would not turn to other media, including radio that is not broadcast in Spanish, if faced with a small but significant increase in the price of advertising time on Spanish-language radio.

23. Accordingly, the provision of advertising time on Spanish-language radio stations to these advertisers is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**B.      *Relevant Geographic Markets***

24. Local and national advertisers buy radio advertising time on Clear Channel, CMP, and Univision radio stations within areas defined by an Arbitron Metro Survey Area ("MSA"). An MSA is the geographic unit that is widely accepted by radio stations, advertisers, and advertising agencies as the standard geographic market to use in evaluating radio audience size and composition.

25. Local and national advertising that is placed on radio stations in an MSA is aimed at reaching listening audiences in that MSA. Radio stations in other MSAs do not provide effective access to these audiences. If there were a small but significant price increase within an MSA, an insufficient number of advertisers would switch their advertising time purchases to radio stations outside the MSA to make the price increase unprofitable.

26. In the Houston and Cincinnati MSAs, Clear Channel and CMP stations compete against each other and against other stations in the provision of radio advertising time to advertisers, regardless of the language broadcast over the station. If there were a small but significant increase in radio advertising prices within the Houston or Cincinnati MSA, an insufficient number of advertisers seeking to reach listeners in the Houston or Cincinnati MSA would switch their advertising time purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Houston and Cincinnati MSAs (the "Overlap Markets") are each relevant geographic markets within the meaning of Section 7 of the Clayton Act.

27.     In the Houston, Las Vegas, and San Francisco MSAs, Clear Channel and Univision compete against each other in the provision of Spanish-language radio advertising time to advertisers. If there were a small but significant increase in Spanish-language radio advertising prices in the Houston, Las Vegas, or San Francisco MSAs, an insufficient number of advertisers seeking to reach listeners in the any of those MSAs would switch their Spanish-language advertising purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Houston, Las Vegas, and San Francisco MSAs (the "Spanish-language Overlap Markets") are each relevant geographic markets within the meaning of Section 7 of the Clayton Act.

## VI.  Harm to Competition

### A.     *Competition in the Relevant Geographic Markets*

#### 1.     *Radio Advertising in the Overlap Markets*

28.     Advertisers who use radio to reach their target audience select radio stations on which to advertise based upon a number of factors including, among others, the size of the station's audience and the characteristics of its audience. Many advertisers seek to reach a large percentage of their target audience by selecting those stations whose listening audience is highly correlated to their target audience.

29.     Clear Channel and CMP vigorously compete for listeners and closely monitor each other's competitive position in the Cincinnati and Houston MSAs. Their stations are similarly formatted and programmed with an eye toward attracting listeners from each other.

30.     Clear Channel and CMP stations in Houston and Cincinnati also currently compete vigorously for radio advertisers who seek to reach the specific demographic groups listening to

their stations. For many local and national advertisers buying radio advertising time in the

Houston and Cincinnati markets, Clear Channel and CMP stations are each other's next best

substitutes. During individualized rate negotiations, the substantial number of advertisers who

desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and

CMP stations against each other to reach better terms.

31.    Radio station ownership in Houston and Cincinnati is highly concentrated, with

Clear Channel and CMP's combined listener share exceeding 34 percent in Houston and 59

percent in Cincinnati. Additionally, Clear Channel and CMP's combined advertising revenue

share exceeds 37 percent in Houston and 65 percent in Cincinnati.

32.    Using a measure of market concentration called the Herfindahl-Hirschman Index

("HHI"), explained in Appendix A annexed hereto, concentration in these markets would increase

significantly as a result of the acquisition, with post-acquisition HHIs of approximately 2,100 in

Houston and approximately 4,700 in Cincinnati, well above the 1,800 threshold at which the

Department normally considers a market to be highly concentrated.

2.    *Spanish-Language Radio Advertising Overlap Markets*

33.    Clear Channel and Univision are currently vigorous competitors and closely

monitor each other's competitive position for Spanish-language listeners in the Houston, Las

Vegas, and San Francisco MSAs, each of which has a large Hispanic population. Their stations in

these markets are similarly formatted and programmed with an eye toward attracting Spanish-

language listeners from each other.

34.    Clear Channel and Univision stations also currently compete vigorously for radio

advertisers who seek to reach Spanish-language listeners. For many local and national advertisers

buying Spanish-language radio advertising time in the Houston, Las Vegas, and San Francisco Spanish-language Overlap Markets, Clear Channel and Univision stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers who desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and Univision stations against each other to reach better terms.

35.    Spanish-language radio station ownership in Houston, Las Vegas, and San Francisco is highly concentrated. Clear Channel and Univision's combined Spanish-language listener share exceeds 75 percent in Houston, 73 percent in Las Vegas, and 70 percent in San Francisco. Additionally, Clear Channel and Univision's combined Spanish-language advertising revenue share exceeds 79 percent in Houston, 78 percent in Las Vegas, and 63 percent in San Francisco.

36.    Using the Herfindahl-Hirschman Index, concentration in these markets would increase significantly as a result of the acquisition, with post-acquisition HHIs exceeding 6,500 in all three markets, well above the 1,800 threshold at which the Department normally considers a market to be highly concentrated.

**B.    *This Acquisition Would Substantially Lessen Competition***

*1.    Radio Advertising in Houston and Cincinnati*

37. ·    Clear Channel is one of only a few radio companies competing with CMP in the sale of radio advertising in Houston and Cincinnati, and within those markets, the two companies are each other's next best substitutes for advertisers seeking to reach several key demographic groups. Bain and THL together possess the ability to control CMP; they hold 50 percent of the voting and equity interests and have the right to choose half of the members of its Board of Directors. CMP's Board of Directors cannot make decisions without the agreement of either Bain or THL, which also

have access to CMP's non-public, competitively sensitive information and its officers and employees. These ownership interests and associated rights give each of Bain and THL, as well as Bain and THL acting together, influence over, if not outright control of, CMP's management decisions.

38.     Upon consummation of their proposed acquisition of interests in Clear Channel, defendants Bain and THL together would also control Clear Channel. Together, they would own at least 70 percent of the equity and voting interests of Clear Channel and have the right to select eight of Clear Channel's 12 directors. In addition, Bain and THL would have access to Clear Channel's non-public, competitively sensitive information and to the company's officers and employees. After the acquisition, each of Bain and THL, as well as Bain and THL acting together, would have influence over, if not outright control of, Clear Channel's management decisions.

39.     Bain or THL, or Bain and THL acting together, would have the incentive and ability to use their ownership, control and influence, and access to information as to both Clear Channel and CMP to reduce competition between the companies in markets where they are significant competitors, resulting in an increase in prices for a significant number of advertisers. The Houston and Cincinnati radio markets are highly concentrated, and these advertisers will find it difficult or impossible to "buy around" Clear Channel and CMP, *i.e.,* to effectively reach their targeted audience without using Clear Channel or CMP radio stations. Thus, Bain's and THL's proposed acquisitions of ownership interests in Clear Channel, if consummated, would substantially reduce competition for radio advertising in the Houston and Cincinnati markets.

2.     *Spanish-language Radio Advertising*

40.     Clear Channel is one of only a few radio companies competing with Univision for Spanish-language radio advertising time in Houston, Las Vegas, and San Francisco, and within those markets, the two companies are each other's next best substitutes for advertisers targeting Spanish-language listeners. THL currently has a 20 percent equity interest and a 14 percent voting interest in Univision, as well as the right to designate three Univision board members. THL also has access to Univision's non-public, competitively sensitive information and its officers and employees. Significant corporate decisions at Univision require the assent of three of its five owners. THL's ownership interest and associated rights give it influence over Univision's management decisions.

41.     Upon consummation of the proposed acquisition of Clear Channel, defendant THL would own at least 35 percent of the equity and voting interest of Clear Channel, as well as a right to choose four of its 12 directors. In addition, after the acquisition, THL would have access to Clear Channel's non-public, competitively sensitive information and its officers and employees. THL's ownership interest and associated rights would give it influence over Clear Channel's management decisions.

42.     THL would have the incentive and ability to use its ownership, control and influence, and access to information as to both Clear Channel and Univision to reduce competition between the companies in markets where they are significant competitors, resulting in an increase in prices for a significant number of advertisers. The Houston, Las Vegas, and San Francisco radio markets are highly concentrated, and these advertisers will find it difficult or impossible to "buy around" Clear Channel and Univision, *i.e.,* to effectively reach their targeted audience without using Clear Channel or Univision radio stations. Thus, THL's proposed acquisition of an ownership interest in Clear

Channel, if consummated, would substantially reduce competition in the Spanish-language Overlap Markets.

### C.    *Entry Conditions*

43.    Entry of new radio stations into the relevant geographic markets would not be timely, likely, or sufficient to mitigate the competitive harm likely to result from this acquisition. Entry could occur by obtaining a license for new radio spectrum or by reformatting an existing station.

44.    Acquisition of new radio spectrum is highly unlikely because spectrum is a scarce and expensive commodity.

45.    Reformatting by existing stations in any of the relevant geographic markets would not be sufficient to mitigate the competitive harm likely to result from this acquisition. For those stations in these markets that have large shares in other coveted demographics, a format shift solely in response to small but significant increases in price by Clear Channel, CMP, or Univision is not likely because it would not be profitable. For those radio stations that may have incentives to change formats in response to small but significant increases in price by Clear Channel, CMP, and Univision, their shift would not be sufficient to mitigate the anticompetitive effects resulting from this acquisition.

### VIII. Violation Alleged

46.    Each and every allegation in paragraphs 1 through 45 of this Complaint is here realleged with the same force and effect as though said paragraphs were here set forth in full.

47.    The effect of the proposed acquisition of interests in Clear Channel by Bain and THL would be to substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act.

-14-

48.    Unless restrained, the transaction would likely have the following effects, among others, in the provision of radio advertising and Spanish-language radio advertising in the relevant geographic markets:

    a.    competition in the sale and provision of advertising on radio stations in the relevant markets would be substantially lessened or eliminated; and

    b.    the prices for advertising on radio stations in the relevant markets would likely increase, and the quality of services would likely decline.

## IX. Requested Relief

49.    The plaintiff requests:

    a.    That Bain's and THL's proposed acquisitions of interests in Clear Channel be adjudged to violate Section 7 of the Clayton Act;

    b.    That the defendants and all persons acting on their behalf be permanently enjoined and restrained from consummating the proposed acquisitions or from entering into or carrying out any agreement, understanding, or plan, the effect of which is to bring radio stations in the relevant markets under common ownership or control;

    c.    That the United States be awarded the costs of this action; and

    d.    That the United States be granted such other and further relief as the Court may deem just and proper.

Dated: February 13, 2008.

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES:**


_____/s/_____        _____/s/_____
Thomas O. Barnett (D.C. Bar No. 426840)        Christopher M. Ries
Assistant Attorney General                     Daniel McCuaig (D.C. Bar No. 478199)
                                               Attorneys for the United States
                                               Litigation III Section
_____/s/_____        Antitrust Division
David L. Meyer                                 United States Department of Justice
Deputy Assistant Attorney General              325 7th Street, N.W., Suite 300
                                               Washington, DC 20530


_____/s/_____
Patricia A. Brink
Deputy Director of Operations


_____/s/_____
John R. Read
Chief, Litigation III Section
Nina B. Hale
Assistant Chief, Litigation III Section

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2008, I caused a copy of the foregoing Complaint, proposed Final Judgment, Competitive Impact Statement, Hold Separate Stipulation and Order, and Explanation of Consent Decree Procedures to be served on the defendants in this matter in the manner set forth below:

By electronic mail and hand delivery:

Counsel for Defendants Bain Capital, LLC and Thomas H. Lee Partners, L.P.
James M. "Mit" Spears
Ropes & Gray LLP
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948
Telephone: (202) 508-4681
Facsimile: (202) 383-8320
Email: mit.spears@ropesgray.com

Counsel for Defendant Clear Channel Communications, Inc.
Phillip A. Proger
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-4668
Facsimile: (202) 626-1700
Email: paproger@jonesday.com

_____/s/_____

Daniel McCuaig (D.C. Bar No. 478199)
United States Department of Justice
Antitrust Division, Litigation III Section
325 Seventh Street, N.W., Suite 300
Washington, DC 20530
Telephone: (202) 307-0520
Facsimile: (202) 514-7308
Email: daniel.mccuaig@usdoj.gov

## APPENDIX A

## DEFINITION OF HHI

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size and distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 are considered to be moderately concentrated, and markets in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise significant antitrust concerns under the Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines.

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | BAIN CAPITAL, LLC<br>THOMAS H. LEE PARTNERS, L.P.<br>CLEAR CHANNEL COMMUNICATIONS, INC. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  **88888**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Christopher M. Ries
Daniel McCuaig
United States Department of Justice
Antitrust Division, Litigation III Section
325 Seventh Street NW, Suite 300
Washington, DC 20530
(202)307-0520

**ATTORNEYS (IF KNOWN)**

James M. "Mit" Spears
Ropes & Gray LLP
700 12th Street NW, Suite 900
Washington, DC 20005
(202)508-4681

Philip A. Proger
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001
(202)879-4668

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ◉ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ◉ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| [X] 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ [ ] Check YES only if demanded in complaint  JURY DEMAND: YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☐ If yes, please complete related case form.

DATE 2/13/08  SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>325 7th Street, N.W., Suite 300<br>Washington, DC 20530, | ) ) ) ) ) | |
| *Plaintiff,* | ) ) | Civil Action No.<br><br>Filed: |
| v. | ) ) | Assigned To: |
| **BAIN CAPITAL, LLC**<br>111 Huntington Ave.<br>Boston, MA 02199, | ) ) ) | Assign Date:<br><br>Description:    Antitrust |
| and | ) ) | |
| **THOMAS H. LEE PARTNERS, L.P.**<br>100 Federal St. 35th Fl.<br>Boston, MA 02110, | ) ) ) ) | |
| and | ) ) | |
| **CLEAR CHANNEL<br>COMMUNICATIONS, INC.**<br>200 E. Basse Rd.<br>San Antonio, TX 78209, | ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I.    **Nature and Purpose of the Proceeding**

Defendants entered into an Agreement and Plan of Merger dated November 16, 2006, pursuant to which a private equity group of investors led by Bain Capital, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL") will acquire a 70 percent interest in Clear Channel Communications Inc. ("Clear Channel"), the largest operator of radio stations in the United States.

Plaintiff filed a civil antitrust Complaint on February 13, 2008 seeking to enjoin the proposed acquisition of a controlling interest in Clear Channel by Bain and THL. The Complaint alleges that, because Bain and THL hold sizeable interests in two radio operators that compete with Clear Channel – Cumulus Media Partners LLC ("CMP") and Univision Communications, Inc. ("Univision") – the proposed acquisition would substantially lessen competition in the provision of radio advertising and Spanish-language radio advertising in several relevant geographic markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition likely would result in the lessening or elimination of competition in the sale and provision of advertising on radio stations in the relevant markets, and increased prices and reduced services associated with advertising on radio stations in those relevant markets.

At the same time the Complaint was filed, plaintiff also filed a Hold Separate Stipulation and Order and a proposed Final Judgment, which, as explained more fully below, are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, defendants are required to divest radio stations in Cincinnati, Ohio; Houston/Galveston, Texas ("Houston"); Las Vegas, Nevada; and San Francisco, California (collectively, the "Divestiture Assets"). Under the Hold Separate Stipulation and Order, defendants will take certain steps to

2

ensure that the Divestiture Assets will remain independent of and uninfluenced by defendants during the pendency of the ordered divestiture, and that competition is maintained during the pendency of the ordered divestiture.

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    Description of the Events Giving Rise to the Alleged Violations

### A.    Defendants, Other Relevant Entities, and the Proposed Transaction

Defendant Bain is a Delaware limited liability company headquartered in Boston, Massachusetts. Bain is one of the world's leading private investment firms with over $40 billion in assets under management. Defendant THL is a Delaware limited partnership headquartered in Boston, Massachusetts and also is one of the world's leading private investment firms. THL currently manages approximately $12 billion of committed capital. Bain and THL raise pools of capital from private investors, controlling and managing that capital through private equity funds and co-investment vehicles that invest in discrete opportunities, such as venture capital, public equity, and leveraged debt assets. Bain and THL, either directly or indirectly through management teams they install, typically manage and operate the assets in which they invest.

Defendant Clear Channel is a diversified media company incorporated in Texas and headquartered in San Antonio, Texas. Clear Channel owns various media outlets including radio stations, domestic and international outdoor advertising assets, television stations, and a media representation firm. Radio broadcasting is Clear Channel's largest business segment,

3

representing over 50 percent of Clear Channel's total revenue. As of February 5, 2008, Clear Channel owned 833 radio stations in the United States, 508 of which were located within the top 100 markets as ranked by Arbitron, an international media marketing and research firm, including stations in Cincinnati, Houston, Las Vegas, and San Francisco.

Bain and THL are owners, along with the Blackstone Group, Cumulus Broadcasting, Inc., and their affiliates, of CMP, a limited liability company formed in 2005. Bain and THL each control 25 percent of the voting interests of CMP and designate two members to its eight member Board of Directors. Together, Bain and THL control 50 percent of the voting interests of CMP and designate one-half of the members of its Board of Directors. As of February 5, 2008, CMP owned 34 radio stations in various markets, including stations that compete head-to-head with Clear Channel stations in Cincinnati and Houston.

THL is an owner, along with Haim Saban, TPG Capital, Providence Equity, Madison Dearborn, and their affiliates, of Univision, the largest broadcaster of Spanish-language television programming in the United States. Univision is headquartered in New York City. THL, through affiliated funds and co-investment vehicles, currently holds a 20 percent equity interest and a 14 percent voting interest in Univision and designates three members to Univision's 17 member Board of Directors. Univision owns 70 radio stations that broadcast in Spanish language in several markets, including Houston, Las Vegas, and San Francisco, where Univision radio stations compete head-to-head with Clear Channel's Spanish-language radio stations.

Bain and THL are planning to acquire, each through various affiliated funds, substantial ownership interests in Clear Channel (the "transaction"). The anticipated value of the transaction

4

is $28 billion. Under the purchase arrangement, Bain and THL each will acquire at least a 35 percent voting and economic interest in Clear Channel, with the remaining interest of up to 30 percent staying in the hands of those current Clear Channel investors and option-holders who elect to retain an equity interest in Clear Channel rather than to receive cash for their shares and/or stock options. Bain and THL each also will acquire the right to designate four directors of the 12 member Clear Channel Board of Directors. If the transaction is consummated, Bain and THL together will control at least 70 percent of the voting interests of Clear Channel and designate two-thirds of the members of the Board of Directors. This acquisition is the subject of the Complaint and proposed Final Judgment filed by plaintiff.

**III.    The Competitive Effects of the Acquisition**

Given their existing ownership interests in CMP and Univision, the effect of Bain's and THL's acquisition of substantial partial ownership interests in Clear Channel may be to substantially lessen competition in markets in which stations owned by CMP or Univision – Houston, Cincinnati, Las Vegas, and San Francisco – compete head-to-head with Clear Channel stations.

**A.    Relevant Product Markets**

**1.    *Radio Advertising is a Relevant Product Market***

Radio stations employ various formats for their programming, such as Adult Contemporary, Sports, or Rock. A station's format can be important in determining the size and characteristics of its listening audience. Companies that operate radio stations, such as Clear Channel, CMP, and Univision, sell advertising time to local and national advertisers in each geographic market where they operate those stations. Advertising rates charged by a radio

5

station are based primarily on the station's ability to attract listening audiences having certain demographic characteristics in the market area that advertisers want to reach, as well as on the number of stations and the relative demand for radio in the market.

Many local and national advertisers purchase radio advertising time because they consider it preferable to advertising in other media to meet their specific needs. They may consider radio advertising time to be more cost-effective than other media to reach their target audiences. They may also consider radio advertising to be more efficient than other media to reach their target audiences. Additionally, radio stations render certain services or promotional opportunities to advertisers that the advertisers cannot exploit as effectively using other media. For these reasons, many local and national advertisers that purchase radio advertising time view radio as a necessary advertising medium, sometimes as a complement to other media. A substantial number of advertisers with strong radio preferences would not turn to other media if faced with a small but significant increase in the price of advertising time on radio stations.

Radio stations generally can identify advertisers with strong radio preferences. Radio stations also negotiate prices individually with advertisers. Consequently, radio stations can charge different advertisers different prices. Because of this ability to price discriminate among customers, radio stations may charge higher prices to the substantial number of advertisers that view radio as particularly effective for their needs, while maintaining lower prices for other advertisers.

In the event of a price increase in radio advertising time, some local and national advertisers may switch some of their advertising to other media rather than absorb a price increase in radio advertising time. However, the existence of such advertisers would not prevent

6

radio stations from profitably raising their prices by a small but significant amount for the substantial number of advertisers that would not switch.

Accordingly, the Complaint alleges that the provision of advertising time on radio stations is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### 2. *Spanish-language Radio Advertising is a Relevant Product Market*

In markets with a large Hispanic population, many local and national advertisers also consider Spanish-language radio to be particularly effective or necessary to reach their desired customers, especially consumers who listen predominantly or exclusively to Spanish-language radio. A substantial number of these advertisers consider Spanish-language radio, either alone or as a complement to other media, to be the most effective way to reach their target audience, and do not consider other media, including non-Spanish-language radio, to be a reasonable substitute. These advertisers would not turn to other media, including radio that is broadcast in a language other than Spanish, if faced with a small but significant increase in the price of advertising time on Spanish-language radio.

Accordingly, the Complaint alleges that the provision of advertising time on Spanish-language radio stations to these advertisers is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### B.    Relevant Geographic Markets

Local and national advertisers buy radio advertising time on stations within areas defined by an Arbitron Metro Survey Area ("MSA"). An MSA is the geographic unit that is widely

7

accepted by radio stations, advertisers, and advertising agencies as the standard geographic market to use in evaluating radio audience size and composition.

Local and national advertising that is placed on radio stations in an MSA is aimed at reaching listening audiences in that MSA. Radio stations in other MSAs do not provide effective access to these audiences. If there were a small but significant price increase within an MSA, an insufficient number of advertisers would switch their advertising time purchases to radio stations outside the MSA to make the price increase unprofitable.

In the Houston and Cincinnati MSAs, Clear Channel and CMP stations compete against each other and against other stations in the provision of radio advertising time to advertisers, regardless of the language broadcast over the station. If there were a small but significant increase in radio advertising prices within the Houston MSA or the Cincinnati MSA, an insufficient number of advertisers seeking to reach listeners in the Houston MSA or the Cincinnati MSA would switch their advertising time purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Complaint alleges that the Houston and Cincinnati MSAs (the "Overlap Markets") are each relevant geographic markets within the meaning of Section 7 of the Clayton Act.

In the Houston MSA, Las Vegas MSA, and San Francisco MSA, Clear Channel and Univision compete against each other in the provision of Spanish-language radio advertising time to advertisers. If there were a small but significant increase in Spanish-language radio advertising prices in the Houston MSA, Las Vegas MSA, or San Francisco MSA, an insufficient number of advertisers seeking to reach listeners in the any of those MSAs would switch their Spanish-language advertising purchases to radio stations outside that MSA to make the price

8

increase unprofitable. Accordingly, the Complaint alleges that the Houston, Las Vegas, and San Francisco MSAs (the "Spanish-language Overlap Markets") are each relevant geographic markets within the meaning of Section 7 of the Clayton Act.

### C.    Competition in the Relevant Markets

#### 1.    *Competition in Radio Advertising in Houston and Cincinnati*

Advertisers that use radio to reach their target audience select radio stations on which to advertise based upon a number of factors including, among others, the size and characteristics of the station's audience. Many advertisers seek to reach a large percentage of their target audience by selecting those stations with a listening audience that is highly correlated to the advertisers' target audience.

Clear Channel and CMP vigorously compete for listeners and closely monitor each other's competitive position in the Cincinnati MSA and the Houston MSA. Their stations are similarly formatted and programmed with an eye toward attracting listeners from each other.

Clear Channel and CMP stations in Houston and Cincinnati also currently compete vigorously for radio advertisers that seek to reach the specific demographic groups listening to their stations. For many local and national advertisers buying radio advertising time in the Houston MSA and the Cincinnati MSA, Clear Channel and CMP stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers that desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and CMP stations against each other to reach better terms.

Radio station ownership in Houston and Cincinnati is highly concentrated, with Clear Channel and CMP's combined advertising revenue share exceeding 37 percent in Houston and

65 percent in Cincinnati. Additionally, Clear Channel and CMP's combined listener share exceeds 34 percent in Houston and 59 percent in Cincinnati.

### 2.    *Competition in Spanish-language Radio Advertising in Houston, Las Vegas, and San Francisco*

Clear Channel and Univision currently are vigorous competitors and closely monitor each other's competitive position for Spanish-language listeners in the Houston, Las Vegas, and San Francisco MSAs, each of which has a large Hispanic population. Their stations in these markets are similarly formatted and programmed with an eye toward attracting Spanish-language listeners from each other.

Clear Channel and Univision stations also currently compete vigorously for radio advertisers that seek to reach Spanish-language listeners. For many local and national advertisers, buying Spanish-language radio advertising time in the Houston, Las Vegas, and San Francisco Spanish-language Overlap Markets, Clear Channel and Univision stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers that desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and Univision stations against each other to reach better terms.

Spanish-language radio station ownership in Houston, Las Vegas, and San Francisco is highly concentrated. Clear Channel and Univision's combined Spanish-language listener share exceeds 75 percent in Houston, 73 percent in Las Vegas, and 70 percent in San Francisco. Additionally, Clear Channel and Univision's combined Spanish-language advertising revenue share exceeds 79 percent in Houston, 78 percent in Las Vegas, and 63 percent in San Francisco.

10

**D.    Anticompetitive Effects of the Transaction in Houston and Cincinnati Radio Advertising Markets**

Clear Channel is one of only a few radio companies competing with CMP in the sale of radio advertising in Houston and Cincinnati, and within those markets, the two companies are each other's next best substitutes for advertisers seeking to reach several key demographic groups. Bain and THL currently control CMP; together they hold 50 percent of the voting and equity interests and have the right to choose half of the members of its Board of Directors. CMP's Board of Directors cannot make decisions without the agreement of either Bain or THL, which have access to CMP's non-public, competitively sensitive information and its officers and employees. These ownership interests and associated rights give each of Bain and THL, as well as Bain and THL acting together, influence over, if not outright control of, CMP's management decisions.

Upon consummation of their proposed acquisition of interests in Clear Channel, defendants Bain and THL together would also control Clear Channel. Together, they would own at least 70 percent of the equity and voting interests of Clear Channel and have the right to select eight of Clear Channel's 12 directors. In addition, Bain and THL would have access to Clear Channel's non-public, competitively sensitive information and its officers and employees. After the acquisition, each of Bain and THL, as well as Bain and THL acting together, would have influence over, if not outright control of, Clear Channel's management decisions.

Bain and THL, either directly or indirectly through management teams they install, typically manage and operate the assets in which they invest. As significant equity holders in both Clear Channel and CMP, Bain and THL each would seek to maximize the value of their investments by increasing the profitability of those companies. With respect to their interests in CMP and Clear Channel, Bain and THL's interests would be aligned and they would be expected

11

to work together to achieve maximum profits at the two companies, including by using their control, influence, and access to information to reduce competition between Clear Channel and CMP in order to increase the companies' total profits.

Bain or THL, or Bain and THL acting together, would have the incentive and ability to use their ownership, control and influence, and access to information as to both Clear Channel and CMP to reduce competition between the companies in markets where they are significant competitors. They could accomplish such a reduction in competition in at least four ways:

1) Through their control of or influence over both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could cause Clear Channel and CMP to coordinate their competitive behavior in a manner that increased both companies' profits but harmed consumers;

2) Through their governance rights relating to both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could install a management team at one of the companies motivated to act in the interest of Bain and THL, and thereby reduce the vigor of its competition against the other company in which Bain and THL had a significant stake;

3) Through their access to non-public, competitively sensitive information of both Clear Channel and CMP, and through their contacts with management at both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could facilitate coordination between Clear Channel and CMP; and

4) Through their control of or influence over both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could cause either Clear Channel or CMP to forbear

12

from competing against the other, knowing that a significant portion of lost sales would be recaptured by a company in which Bain and THL had a significant ownership interest.

For example, Clear Channel's management team, acting pursuant to either Bain's or THL's corporate influence, or pursuant to their joint voting control, could be expected to increase the price of advertising at Clear Channel to those advertisers that view CMP as Clear Channel's closest alternative, knowing that Bain and THL would reap the benefits of the price increase at Clear Channel and recapture the lost profits from any advertisers that chose to switch to CMP. Alternatively, the transaction would result in higher prices for purchasers of radio advertising if management teams at Clear Channel and CMP, acting pursuant to either Bain's or THL's influence or their joint voting control, were to go along with price increases at the other's stations, which would be known to Bain and THL even if not publicly disclosed. Given that Houston and Cincinnati are highly concentrated markets, advertisers would find it difficult or impossible to "buy around" Clear Channel and CMP, *i.e.*, to effectively reach their targeted audience without using Clear Channel or CMP radio stations.

Thus, the Complaint alleges that Bain's and THL's proposed acquisitions of ownership interests in Clear Channel, if consummated, would substantially reduce competition for radio advertising in the Houston and Cincinnati Overlap Markets.

### E.    Anticompetitive Effects of the Acquisition in Houston, Las Vegas, and San Francisco Spanish-language Radio Markets

Clear Channel is one of only a few radio companies competing with Univision for Spanish-language radio advertising time in Houston, Las Vegas, and San Francisco, and within those markets, the two companies are each other's next best substitutes for advertisers targeting Spanish-language listeners.  THL currently has a 20 percent equity interest and a 14 percent voting interest

13

in Univision, as well as the right to designate three Univision board members. THL also has access to Univision's non-public, competitively sensitive information and its officers and employees. Significant corporate decisions at Univision require the assent of three of its five owners. THL's ownership interest and associated rights give it influence over Univision's management decisions.

Upon consummation of the proposed acquisition of Clear Channel, defendant THL would own at least 35 percent of the equity and voting interest of Clear Channel, as well as a right to choose four of its 12 directors. In addition, after the acquisition, THL would have access to Clear Channel's non-public, competitively sensitive information and its officers and employees. THL's ownership interest and associated rights would give it influence over Clear Channel's management decisions.

As a significant equity holder in both Clear Channel and Univision, THL would seek to maximize the value of its investments by increasing the profitability of those companies. THL likely would work to achieve maximum profits at the two companies, including by using its influence and access to information to reduce competition between Clear Channel and Univision, in order to increase THL's total profits.

THL would have the incentive and ability to use its ownership, control and influence, and access to information as to both Clear Channel and Univision to reduce competition between the companies in markets where they are significant competitors. THL could accomplish such a reduction in competition in at least four ways:

14

1) Through its influence over both Clear Channel and Univision, THL could cause Clear

Channel and Univision to coordinate their competitive behavior in a manner that increased

both companies' profits but harmed consumers;

2) Through its governance rights relating to both Clear Channel and Univision, THL could

work to install a management team at one of the companies motivated to act in THL's

interests, or influence a management team to account for THL's interests, and thereby

reduce the vigor of its competition against the other company in which THL had a

significant stake;

3) Through its access to non-public, competitively sensitive information of both Clear

Channel and Univision, and through its contacts with management at both Clear Channel

and Univision, THL could facilitate coordination between Clear Channel and Univision;

and

4) Through its influence over both Clear Channel and Univision, THL could cause either

Clear Channel or Univision to forbear from competing against the other, knowing that a

significant portion of lost sales would be recaptured by a company in which THL had a

significant ownership interest.

For example, as a result of the acquisition, with access to both companies' non-public

competitively sensitive information, THL would have the ability and the incentive to facilitate the

coordination of pricing and other competitive decisions between Clear Channel and Univision in

the Spanish-language Overlap Markets. Given that those markets are highly concentrated,

advertisers would find it difficult or impossible to "buy around" Clear Channel and Univision, *i.e.*,

to effectively reach their targeted audience without using Clear Channel or Univision radio

15

stations, resulting in higher prices and lower service levels for purchasers of Spanish-language radio advertising. Thus, the Complaint alleges that THL's acquisition of a substantial partial ownership interest in Clear Channel would substantially lessen competition in the sale of Spanish-language radio advertising in Houston, Las Vegas, and San Francisco, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

### F.    Federal Communication Commission Obligations

In order to meet FCC radio ownership rules, Bain and THL, prior to consummating their acquisition of ownerships interests in Clear Channel, plan to convert all of their governance rights and ownership interests in CMP into passive equity interests, which means they will no longer have voting rights and will withdraw all Bain and THL directors from the CMP Board. For the same reason, THL likewise plans to convert its interests in Univision to passive equity interests, and withdraw from the Univision Board.

Such changes would not eliminate the potential for the competitive harm in the markets where Clear Channel competes with CMP or Univision. Because the FCC-required conversions would not reduce the magnitude of any defendant's equity stake in the three companies, the defendants would still profit from any reduction in competition between either Clear Channel and CMP or between Clear Channel and Univision. In addition, the FCC-required conversions would not affect Bain or THL's control of Clear Channel, or eliminate their access to non-public, confidential information and officers and employees at Clear Channel, CMP, and Univision.

As a result, the conversions would not eliminate the ability of Bain and THL, whether acting individually or together, to cause a reduction in competition. For example, Bain and/or THL would still have the incentive and ability, given their combined 70 percent share in Clear Channel,

16

to influence Clear Channel's management team to increase the price of advertising at Clear Channel to those advertisers that view CMP as Clear Channel's closest alternative, knowing that Bain and THL would reap the benefits of the price increase at Clear Channel and recapture the lost profits from any advertisers that chose to switch to CMP. Alternatively, because the FCC regulatory scheme does not require that THL relinquish its access to non-public, confidential information at either Clear Channel or Univision, THL could still have the ability to be an information conduit between the two companies so as to facilitate the coordination of pricing and other competitive decisions between them in the Spanish-language Overlap Markets. Accordingly, a decree mandating divestitures is necessary to restore competition.

### G.    Entry Will Not Mitigate the Likely Anticompetitive Effects

Successful entry into the Houston or Cincinnati Overlap Markets or the Houston, Las Vegas, or San Francisco Spanish-language Overlap Markets would not be timely, likely, or sufficient to offset the anticompetitive effects resulting from this transaction.

Entry could occur by obtaining a license for new radio spectrum or by reformatting an existing station. However, acquisition of new radio spectrum is highly unlikely because spectrum is a scarce and expensive commodity. Reformatting by existing stations in any of the relevant geographic markets would not be sufficient to mitigate the competitive harm likely to result from this acquisition. For those stations in these markets that have large shares in other coveted demographics, a format shift solely in response to small but significant increases in price by Clear Channel, CMP, or Univision is not likely because it would not be profitable. For those radio stations that may have incentives to change formats in response to small but significant increases in

17

price by Clear Channel, CMP, and Univision, their shift would not be sufficient to mitigate the anticompetitive effects resulting from this acquisition.

## IV.    Explanation of the Proposed Final Judgment

### A.    Clear Channel Radio Stations Must Be Divested

The proposed Final Judgment will eliminate the anticompetitive effects that would result from Bain's and THL's acquisition of substantial ownership interests in Clear Channel. Paragraph IV(A) of the proposed Final Judgment requires defendant Clear Channel, within 90 days after the closing of their transaction, or five calendar days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest certain of its radio stations in Houston, Cincinnati, Las Vegas, and San Francisco. In order to maximize the likelihood that appropriate radio stations are divested promptly to qualified buyers, the proposed Final Judgment provides Clear Channel with the flexibility to choose between two equivalently effective divestiture packages in Houston and Cincinnati.

The Divestiture Assets comprise the following stations and all tangible and intangible assets used in their operation:

> 1.    the Clear Channel Assets are:
>
>> a.    a Houston station -- either KHMX or, at the discretion of the defendants, KTBZ;
>>
>> b.    two Cincinnati stations -- either WLW and WKFS or, at the discretion of the defendants, WOFX and WNNF;
>
> 2.    the Clear Channel Spanish-language Assets are:
>
>> a.    KLOL, a Houston Spanish-language station;

      b.      KWID, a Las Vegas Spanish-language station; and

      c.      KSJO, a San Francisco Spanish-language station.

These stations must be divested to acquirer(s) that, in the United States' sole judgment, will use them as part of viable, ongoing businesses engaged in commercial radio broadcasting or Spanish-language radio broadcasting. The proposed Final Judgment requires defendants to take all reasonable steps necessary to accomplish the divestiture quickly and to cooperate with prospective acquirers.

The sale of the Divestiture Assets according to the terms of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the Houston and Cincinnati Overlap Markets for radio advertising and in the Houston, Las Vegas, and San Francisco Spanish-language Overlap Markets for Spanish-language radio advertising. In each market, the divestitures will establish a new, independent, and economically viable competitor.

The proposed Final Judgment relieves the defendants of some or all of their obligations to divest under three sets of circumstances. First, the proposed Final Judgment takes into account that the FCC has required that Clear Channel sell a San Francisco station in order to comply with FCC media ownership limitations. Paragraph IV(D) of the proposed Final Judgment thus provides that, if the San Francisco station has been transferred to an FCC-authorized trust prior to the completion of the required divestitures, defendants' obligation to divest that station is suspended and will be eliminated if the station is sold under the terms of the FCC-authorized trust, in which case the objectives of the proposed Final Judgment would have been achieved.

Second, if Bain and THL both divest 100 percent of their interests in CMP, thereby eliminating the overlap between CMP and Clear Channel achieved by the transaction, Paragraph

19

IV(B) of the proposed Final Judgment would no longer require that the defendants divest those stations that comprise the Clear Channel Assets. If these assets are not divested, Paragraph XI(D) of the proposed Final Judgment would bar the reacquisition by Bain or THL of any interest in CMP so long as they continue to have some interest in Clear Channel.

Third, if THL divests 100 percent of its interests in Univision, thereby eliminating the overlap between Univision and Clear Channel achieved by the transaction, Paragraph IV(C) of the proposed Final Judgment would no longer require that the defendants divest those stations that comprise the Clear Channel Spanish-language Assets. If these assets are not divested, however, Paragraph XI(E) of the proposed Final Judgment would bar the reacquisition of by THL of any interest in Univision so long as it continues to have some interest in Clear Channel.

### B.    Timing of Divestitures

In antitrust cases involving mergers or joint ventures in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. As noted above, the proposed Final Judgment requires defendant Clear Channel to complete the divestitures within 90 days after the transaction closes, or five calendar days after notice of the entry of the Final Judgment by the Court, whichever is later. The United States in its sole discretion may extend the time period for divestiture by up to 60 days.

In this matter, Paragraph IV(A) of the proposed Final Judgment also provides for an additional extension in certain circumstances. This extension takes into account the FCC's role in connection with transfers of radio stations from one operator to another. If the defendants have found a buyer or buyers for the assets (and the buyers have been approved by the United States) and have filed applications with the FCC seeking approval to assign or transfer the licenses within

20

the initial period for divestiture, but the FCC has not yet issued a final order approving such transfers, the proposed Final Judgment allows for an extension of the divestiture period until ten days after the FCC's order approving the transfer is issued.

The divestiture timing provisions of the proposed Final Judgment will ensure that the divestitures are carried out in a timely manner, and at the same time will permit defendants an adequate opportunity to accomplish the divestitures consistent with their FCC obligations. Even if the Clear Channel stations have not been divested upon consummation of the transaction, there should be no adverse impact on competition given the limited duration of the period of common ownership and the detailed requirements of the Hold Separate Stipulation and Order.

**C.    Use of a Trustee**

In the event that the defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by plaintiff to effect the divestiture.

Section V details the requirements for the establishment of the divestiture trust, the selection and compensation of the trustee, and the responsibilities of the trustee in connection with the divestiture. The trustee will have the sole responsibility, under Paragraph V(B), for the sale of the stations to be divested. The trustee has the authority to accomplish the divestiture at the earliest possible time and "at such price and on such terms as are then obtainable upon reasonable effort by the trustee."

The proposed Final Judgment provides that defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured, under Paragraph V(D) of the proposed Final Judgment, so as to provide an incentive for the trustee based on the price and terms obtained and the

speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and plaintiff setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and plaintiff will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the Final Judgment, including extending the trust or term of the trustee's appointment.

### D.    The Hold Separate Stipulation and Order

The Hold Separate Stipulation and Order, filed at the same time as the Complaint, ensures that, pending divestiture of the Clear Channel stations, (i) defendants will take no steps to limit those stations' ability to operate as competitively independent, economically viable, and ongoing business concerns, (ii) defendants will not influence those stations' business, and (iii) competition will be maintained. The Hold Separate Stipulation and Order requires Clear Channel to hold the stations to be divested separate as independent, ongoing, economically viable, and active competitors in their particular markets. This means that their management, including decision-making functions relating to marketing and pricing, will be kept separate and apart from, and not influenced by, defendants Bain or THL or Clear Channel's other operations.

### V.    Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the

proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against defendants.

## VI.    Procedures Available for Modification of the Proposed Final Judgment

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to plaintiff written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register or the last date of publication in a newspaper of the summary of this Competitive Impact Statement; whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of plaintiff will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> John R. Read
> Chief, Litigation III Section
> Antitrust Division, U.S. Department of Justice
> 325 7th Street, N.W., Suite 300
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VII.   Alternatives to the Proposed Final Judgment

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against Bain and THL's acquisition of Clear Channel. Plaintiff is satisfied, however, that the divestiture of the stations described in the proposed Final Judgment will preserve competition in the provision of radio advertising in Houston and Cincinnati, and competition in the provision of Spanish-language radio advertising in Houston, Las Vegas and San Francisco, the relevant markets identified in the Complaint. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VIII.   Standard of Review Under the APPA for the Proposed Final Judgment

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment

24

> that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is

necessarily a limited one, as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448,

1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1

(D.D.C. 2007) (assessing public interest standard under the Tunney Act).[1]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the

APPA a court considers, among other things, the relationship between the remedy secured and the

specific allegations set forth in the government's complaint, whether the decree is sufficiently clear,

whether enforcement mechanisms are sufficient, and whether the decree may positively harm third

parties. *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy of the relief secured by the

decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the

public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v.*

*Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United*

*States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001).  Courts have held that:

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

25

> The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am.*

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

*Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator

27

Tunney explained: "The court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement

through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).

Rather, the procedure for the public interest determination is left to the discretion of the court, with

the recognition that the court's "scope of review remains sharply proscribed by precedent and the

nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## IX.    **Determinative Documents**

There are no determinative materials or documents within the meaning of the APPA that were considered by plaintiff United States in formulating the proposed Final Judgment.


Dated: February 13, 2008

                               Respectfully submitted,


                                    _____/s/_____

Daniel McCuaig (DC Bar No.478199)
Christopher Ries
Attorneys, Litigation III Section
Antitrust Division
U.S. Department of Justice
325 7th Street, N.W., Suite 300
Washington, D.C.  20530
(202) 307-0520
Facsimile: (202) 514-7308

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>325 7th Street, N.W., Suite 300<br>Washington, D.C. 20530,<br><br>           Plaintiff,<br><br><br>       v.<br><br>**BAIN CAPITAL, LLC**<br>111 Huntington Ave.<br>Boston, Massachusetts 02199,<br><br>and<br><br>**THOMAS H. LEE PARTNERS, L.P.**<br>100 Federal St. 35th Fl.<br>Boston, Massachusetts 02110,<br><br>and<br><br>**CLEAR CHANNEL<br>COMMUNICATIONS, INC.**<br>200 E. Basse Rd.<br>San Antonio, Texas 78209,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No.<br><br>      Filed: |

**HOLD SEPARATE STIPULATION AND ORDER**

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

**I.**

DEFINITIONS

As used in this Hold Separate Stipulation and Order ("Stipulation"):

A.    "Bain" means Bain Capital, LLC, a Delaware limited liability company headquartered in Boston, Massachusetts, its directors, officers, partners, managers, employees, agents,

representatives, successors, and assigns; and its joint ventures, subsidiaries, partnerships, divisions, groups, affiliates, investment funds, hedge funds, and certain other private equity investment vehicles controlled or managed by Bain Capital Partners, LLC, and the respective directors, officers, general partners, managers, employees, agents, representatives, successors, and assigns of each.

B.     "THL" means Thomas H. Lee Partners, L.P., a Delaware limited partnership headquartered in Boston, Massachusetts, its directors, officers, partners, managers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries, partnerships, divisions, groups, affiliates, investment funds, hedge funds, and certain other private equity investment vehicles controlled or managed by Thomas H. Lee Partners, L.P., and the respective directors, officers, general partners, managers, employees, agents, representatives, successors, and assigns of each.

C.     "Clear Channel" means Clear Channel Communications, Inc., a Texas corporation headquartered in San Antonio, Texas, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D.     "MSA" means Metro Survey Area.  A Metro Survey Area is a geographical area in which Arbitron, a radio industry survey company, collects listener data to aid radio stations, advertisers, and advertising agencies in evaluating radio audience size and composition.

E.     "Cincinnati" means the Cincinnati, Ohio MSA.

F.     "Houston" means the Houston/Galveston, Texas MSA.

G.     "Las Vegas" means the Las Vegas, Nevada MSA.

H.     "San Francisco" means the San Francisco, California MSA.

I.     "WLW" means the radio station WLW-AM located in Cincinnati owned by defendant Clear Channel.

J.    "WKFS" means the radio station WKFS-FM located in Cincinnati owned by defendant Clear Channel.

K.    "WOFX" means the radio station WOFX-FM located in Cincinnati owned by defendant Clear Channel.

L.    "WNNF" means the radio station WNNF located in Cincinnati owned by defendant Clear Channel.

M.    "KLOL" means the radio station KLOL-FM located in Houston owned by defendant Clear Channel.

N.    "KHMX" means the radio station KHMX-FM located in Houston owned by defendant Clear Channel.

O.    "KTBZ" means the radio station KTBZ-FM located in Houston owned by defendant Clear Channel.

P.    "KWID" means the radio station KWID-FM located in Las Vegas owned by defendant Clear Channel.

Q.    "KSJO" means the radio station KSJO-FM located in San Francisco owned by defendant Clear Channel.

R.    "Cincinnati Assets" means either (1) WLW and WKFS or, at the discretion of the defendants, (2) WOFX and WNNF.

S.    "Houston Assets" means either (1) KHMX or, at the discretion of the defendants, (2) KTBZ.

T.    "Houston Spanish-language Assets" means KLOL.

U.    "Las Vegas Spanish-language Assets" means KWID.

V.    "San Francisco Spanish-language Assets" means KSJO.

W.    "Clear Channel Assets" means, collectively, the Cincinnati Assets and the Houston Assets.

X.    "Clear Channel Spanish-language Assets" means, collectively, the Houston Spanish-

-3-

language Assets, the Las Vegas Spanish-language Assets, and the San Francisco Spanish-language Assets.

Y.    "Divestiture Assets" means all of the assets, tangible or intangible, used in the operations of the Clear Channel Assets and the Clear Channel Spanish-language Assets, including, but not limited to: (i) all licenses, permits, authorizations, and applications therefor issued by the Federal Communications Commission ("FCC") and other government agencies related to the Clear Channel Assets and the Clear Channel Spanish-language Assets; (ii) all contracts (including programming contracts and rights), agreements, leases, and commitments and understandings of defendants relating to the operations of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (iii) all interest in real property (owned or leased) relating to the transmitter facilities of the Clear Channel Assets and the Clear Channel Spanish-language Assets and all items of tangible property used in the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets at such transmitter facilities; (iv) all interest in the real property lease relating to the studios of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (v) all broadcast equipment, office equipment, office furniture, fixtures, materials, supplies, and other tangible property used in the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (vi) all interests in trademarks, service marks, trade names, copyrights, patents, slogans, programming materials, and promotional materials relating to the Clear Channel Assets and the Clear Channel Spanish-language Assets; (vii) all customer lists, accounts, and credit records relating to the Clear Channel Assets and the Clear Channel Spanish-language Assets; and (viii) all other records maintained by defendants in connection with the Clear Channel Assets and the Clear Channel Spanish-language Assets; however, assets that:  (a) are principally devoted to the operation of stations other than the Clear Channel Assets and the Clear Channel Spanish-language Assets or to the operation of their parent companies, and are not necessary to the operation of the Clear Channel Assets and the Clear Channel Spanish-language

-4-

Assets shall not be included within the Divestiture Assets; or (b) are part of a shared group of like assets (including, but not limited to, microphones and office supplies) shall be allocated to Clear Channel Assets and Clear Channel Spanish-language Assets, and thus to Divestiture Assets, only in proportion with their use by the Clear Channel Assets or the Clear Channel Spanish-language Assets.

Z.     "Acquirer" means the entity or entities to whom defendants divest any Divestiture Assets.

AA.     "Competitively sensitive information," includes non-public information relating to sales, marketing, current or future advertising and advertising rates, revenues, expenses and/or profitability information, affiliate relationships, program roll-out plans or talent contracts relating to any individual radio station asset.

## II.

### OBJECTIVES

The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Divestiture Assets for the purpose of preserving viable competition in the sale of radio advertising time in areas served by the Divestiture Assets to remedy the anticompetitive effects that the United States alleges would otherwise result from the acquisition of a substantial interest in Clear Channel by defendant Bain and defendant THL.  This Stipulation ensures that, prior to such divestiture, the Divestiture Assets will remain independent, economically viable, ongoing businesses, and that competition is maintained during the pendency of the ordered divestiture.

## III.

### JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action and over the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia.

**IV.**

COMPLIANCE WITH ENTRY OF FINAL JUDGMENT

A.     The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B.     Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the closing of the transaction that is the subject of the proposed Final Judgment, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.     Defendants shall not consummate the transaction sought to be enjoined by the Complaint before the Court has signed this Stipulation.

D.     This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.     In the event that: (1) the United States has withdrawn its consent, as provided in Paragraph IV(A), above; or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further

-6-

obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

F.      Defendants represent that the divestitures ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship, or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V.

## HOLD SEPARATE PROVISIONS

Until the divestitures required by the Final Judgment has been accomplished:

A.      Within twenty (20) calendar days after the entry of this Stipulation, defendant Clear Channel will inform the United States of the steps the defendants have taken to comply with this Stipulation.

B.      While this Stipulation remains in effect, defendant Clear Channel shall, with respect to the Divestiture Assets, have the following obligations:

      1.      to take all steps necessary to ensure that (i) the Clear Channel Assets will be maintained and operated as independent, ongoing, economically viable, and active competitors in the commercial radio broadcasting business; (ii) the Clear Channel Spanish-language Assets will be maintained and operated as independent, ongoing, economically viable, and active competitors in the commercial Spanish-language radio broadcasting business; (iii) the management of the Divestiture Assets, including the performance of decision-making functions regarding marketing and pricing, will be kept separate and apart from and not influenced by defendants Bain or THL or Clear Channel's other operations; and (iv) the books, records, competitively sensitive sales, marketing, and pricing information, and decision-making related to any of the Divestiture Assets will be kept separate and apart from defendants Bain and THL and Clear Channel's other operations;

-7-

2.     to use all reasonable efforts to maintain and increase sales of radio advertising time by the Divestiture Assets, and shall maintain at 2007 or previously approved levels for 2008, whichever are higher, all promotional advertising, sales, technical assistance, marketing, and merchandising support for the Divestiture Assets;

3.     to provide sufficient working capital and lines and sources of credit to continue to maintain the Divestiture Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Paragraphs V(A) and (B);

4.     to take all steps necessary to ensure that the Divestiture Assets are fully maintained in operable condition, and to maintain and adhere to normal repair and maintenance schedules for the Divestiture Assets;

5.     to maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Divestiture Assets.

6.     to not transfer or reassign employees with primary responsibility for sales, marketing, and programming of the Divestiture Assets to any other radio station, except for transfer bids initiated by employees pursuant to defendants' regular, established job posting policies, and to provide the United States with ten (10) days' notice of such transfer.

C.     The obligations enumerated in Paragraph V(B) apply to the San Francisco Spanish-language Assets unless and until those assets have been transferred to an FCC-authorized trust. Such obligations shall be suspended as to the San Francisco Spanish-language Assets if and when those assets have been transferred to an FCC-authorized trust.

-8-

D.      While this Stipulation remains in effect, defendants Bain and THL shall not use or attempt to use their ownership interest in Clear Channel to exert any influence over the operation of the Divestiture Assets.

E.      While this Stipulation remains in effect, defendants Bain and THL shall not have access to any Competitively Sensitive Information regarding any aspect of the operation of the Divestiture Assets, including any plans or proposals with respect thereto.

F.      Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, license, pledge, or otherwise dispose of any of the Divestiture Assets.

G.      Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets.

H.      Within ten (10) days of the filing of the Complaint, defendant Clear Channel shall appoint, subject to the approval of the United States, a person or persons to oversee the Divestiture Assets, who also will be responsible for defendants' compliance with this section. This person or persons shall have complete managerial responsibility for the Divestiture Assets, subject to the provisions of the Final Judgment. In the event that any such person is unable to perform his or her duties, defendant Clear Channel shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should defendant Clear Channel fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement at defendants' expense.

I.      Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to monitor and complete the divestiture pursuant to the Final Judgment to an Acquirer or Acquirers acceptable to the United States.

J.      This Stipulation shall remain in effect from the date of the closing of the transaction that is the subject of the Final Judgment until consummation of the divestitures required by the Final Judgment or until further order of the Court.

Dated: February 13, 2008

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:

FOR DEFENDANT
BAIN CAPITAL, LLC and
DEFENDANT THOMAS H. LEE PARTNERS
L.P.:

_____/s/_____
Christopher M. Ries
Daniel McCuaig (D.C. Bar No. 478199)
United States Department of Justice
Antitrust Division, Litigation III Section
325 Seventh Street, N.W., Suite 300
Washington, DC 20530
(202) 307-0520

_____/s/_____
James M. "Mit" Spears (D.C. Bar No. 428958)
Ropes & Gray LLP
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948
(202) 508-4681

FOR DEFENDANT
CLEAR CHANNEL COMMUNICATIONS,
INC.:

_____/s/_____
Phillip A. Proger (D.C. Bar No. 929596)
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
(202) 879-4668

ORDER

IT IS SO ORDERED by the Court, this __ day of _____.


_____
United States District Court Judge


-11-

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>325 7th Street, N.W., Suite 300<br>Washington, D.C. 20530,<br><br>               Plaintiff,<br><br><br>        v.<br><br>**BAIN CAPITAL, LLC**<br>111 Huntington Ave.<br>Boston, Massachusetts 02199,<br><br>and<br><br>**THOMAS H. LEE PARTNERS, L.P.**<br>100 Federal St. 35th Fl.<br>Boston, Massachusetts 02110<br><br>and<br><br>**CLEAR CHANNEL<br>COMMUNICATIONS, INC.**<br>200 E. Basse Rd.<br>San Antonio, Texas 78209,<br><br>            Defendants. | Civil Action No.<br><br>Filed: |

### FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on February 13, 2008, the United States and defendants Bain Capital, LLC ("Bain"), Thomas H. Lee Partners, L.P. ("THL"), and Clear Channel Communications, Inc. ("Clear Channel"), by their respective attorneys, have consented to entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15. U.S.C. § 18.

## II. Definitions

As used in this Final Judgment:

A.     "Bain" means Bain Capital, LLC, a Delaware limited liability company headquartered in Boston, Massachusetts, its directors, officers, partners, managers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries, partnerships, divisions, groups, affiliates, investment funds, hedge funds, and certain other private equity

- 2 -

investment vehicles controlled or managed by Bain Capital Partners, LLC, and the respective directors, officers, general partners, managers, employees, agents, representatives, successors, and assigns of each.

B.    "THL" means Thomas H. Lee Partners, L.P., a Delaware limited partnership headquartered in Boston, Massachusetts, its directors, officers, partners, managers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries, partnerships, divisions, groups, affiliates, investment funds, hedge funds, and certain other private equity investment vehicles controlled or managed by Thomas H. Lee Partners, L.P., and the respective directors, officers, general partners, managers, employees, agents, representatives, successors, and assigns of each.

C.    "Clear Channel" means Clear Channel Communications, Inc., a Texas corporation headquartered in San Antonio, Texas, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D.    "Univision" means Univision Communications, Inc., a Delaware corporation headquartered in Los Angeles, California, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E.    "BMP-Univision Holdings" means Broadcasting Media Partners, Inc., a Delaware corporation headquartered in New York that holds all of Univision's outstanding shares, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

F.    "CMP Susquehanna" means CMP Susquehanna Holdings, Corp., a Delaware corporation headquartered in Atlanta that is owned by Cumulus Media Partners, its directors, officers,

- 3 -

managers, agents and employees, its successors and assigns, and its subsidiaries, divisions,

groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents,

and employees.

G.    "Cumulus Media Partners" means Cumulus Media Partners, LLC, a Delaware limited

liability company headquartered in Atlanta, its directors, officers, managers, agents and

employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates,

partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

H.    "MSA" means Metro Survey Area.  A Metro Survey Area is a geographical area in which

Arbitron, a radio industry survey company, collects listener data to aid radio stations, advertisers,

and advertising agencies in evaluating radio audience size and composition.

I.    "Cincinnati" means the Cincinnati, Ohio MSA.

J.    "Houston" means the Houston/Galveston, Texas MSA.

K.    "Las Vegas" means the Las Vegas, Nevada MSA.

L.    "San Francisco" means the San Francisco, California MSA.

M.    "WLW" means the radio station WLW-AM located in Cincinnati owned by defendant

Clear Channel.

N.    "WKFS" means the radio station WKFS-FM located in Cincinnati owned by defendant

Clear Channel.

O.    "WOFX" means the radio station WOFX-FM located in Cincinnati owned by defendant

Clear Channel.

P.    "WNNF" means the radio station WNNF located in Cincinnati owned by defendant Clear

Channel.

Q.    "KLOL" means the radio station KLOL-FM located in Houston owned by defendant Clear

Channel.

R.    "KHMX" means the radio station KHMX-FM located in Houston owned by defendant

Clear Channel.

S.    "KTBZ" means the radio station KTBZ-FM located in Houston owned by defendant Clear

Channel.

T.    "KWID" means the radio station KWID-FM located in Las Vegas owned by defendant

Clear Channel.

U.    "KSJO" means the radio station KSJO-FM located in San Francisco owned by defendant

Clear Channel.

V.    "Cincinnati Assets" means either (1) WLW and WKFS or, at the discretion of the

defendants, (2) WOFX and WNNF.

W.    "Houston Assets" means either (1) KHMX or, at the discretion of the defendants, (2)

KTBZ.

X.    "Houston Spanish-language Assets" means KLOL.

Y.    "Las Vegas Spanish-language Assets" means KWID.

Z.    "San Francisco Spanish-language Assets" means KSJO.

AA.    "Clear Channel Assets" means, collectively, the Cincinnati Assets and the Houston Assets.

AB.    "Clear Channel Spanish-language Assets" means, collectively, the Houston Spanish-

language Assets, Las Vegas Spanish-language Assets, and San Francisco Spanish-language

Assets.

AC.    "Divestiture Assets" means all of the assets, tangible or intangible, used in the operations

of the Clear Channel Assets and the Clear Channel Spanish-language Assets, including, but not

limited to: (i) all licenses, permits, authorizations, and applications therefor issued by the Federal

Communications Commission ("FCC") and other government agencies related to the Clear

Channel Assets and the Clear Channel Spanish-language Assets; (ii) all contracts (including

programming contracts and rights), agreements, leases, and commitments and understandings of

defendants relating to the operations of the Clear Channel Assets and the Clear Channel Spanish-

- 5 -

language Assets; (iii) all interest in real property (owned or leased) relating to the transmitter facilities of the Clear Channel Assets and the Clear Channel Spanish-language Assets and all items of tangible property used in the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets at such transmitter facilities; (iv) all interest in the real property lease relating to the studios of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (v) all broadcast equipment, office equipment, office furniture, fixtures, materials, supplies, and other tangible property used in the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (vi) all interests in trademarks, service marks, trade names, copyrights, patents, slogans, programming materials, and promotional materials relating to the Clear Channel Assets and the Clear Channel Spanish-language Assets; (vii) all customer lists, accounts, and credit records relating to the Clear Channel Assets and the Clear Channel Spanish-language Assets; and (viii) all other records maintained by defendants in connection with the Clear Channel Assets and the Clear Channel Spanish-language Assets; however, assets that: (a) are principally devoted to the operation of stations other than the Clear Channel Assets and the Clear Channel Spanish-language Assets or to the operation of their parent companies, and are not necessary to the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets shall not be included within the Divestiture Assets; or (b) are part of a shared group of like assets (including, but not limited to, microphones and office supplies) shall be allocated to Clear Channel Assets and Clear Channel Spanish-language Assets, and thus to Divestiture Assets, only in proportion with their use by the Clear Channel Assets or the Clear Channel Spanish-language Assets.

AD.    "Clear Channel Divestiture Assets" are the Divestiture Assets relating to the Clear Channel Assets.

AE.    "Clear Channel Spanish-language Divestiture Assets" are the Divestiture Assets relating to the Clear Channel Spanish-language Assets.

- 6 -

AF.     "Acquirer" means the entity or entities to whom defendants divest any Divestiture Assets.

### III. Applicability

A.      This Final Judgment applies to THL, Bain, and Clear Channel, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the acquirers of the assets divested pursuant to this Final Judgment.

### IV. Divestitures

A.      Defendant Clear Channel is ordered and directed to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole discretion, within ninety (90) calendar days from the date of the closing of the transaction that is the subject of the Final Judgment or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed in total sixty (60) calendar days, and shall notify the Court in each such circumstance. If, within the period permitted for divestitures, defendants have filed applications with the FCC seeking approval to assign or transfer licenses to the Acquirer(s) (previously approved by the United States, pursuant to the terms of this paragraph) of the Clear Channel Assets and the Clear Channel Spanish-language Assets, but an order or other dispositive action by the FCC on such applications has not been issued before the end of the period permitted for divestitures, the period shall be extended with respect to divestiture of those Clear Channel Assets and Clear Channel Spanish-language Assets for which FCC final approval has not been issued until ten (10) calendar days after such

- 7 -

approval is received. Defendant Clear Channel agrees to use its best efforts to divest the Divestiture Assets, and to obtain all regulatory approvals necessary for such divestitures, as expeditiously as possible.

B.    The Divestiture Assets shall not include the Clear Channel Assets if, prior to the completion of the divestitures required by this Final Judgment, both THL and Bain no longer have any have limited liability company membership or any type of debt, equity governance, or other beneficial interest in either Cumulus Media Partners or CMP Susquehanna, and have provided written certification (and supporting documentation) satisfactory to the United States that they have divested all such assets.

C.    The Divestiture Assets shall not include the Clear Channel Spanish-language Assets if, prior to the completion of the divestitures required by this Final Judgment, defendant THL no longer has any shares of capital stock or any type of debt, equity, governance, or other beneficial interest in either BMP-Univision Holdings or Univision, and has provided written certification (and supporting documentation) satisfactory to the United States that it has divested all such assets.

D.    The obligation to divest the San Francisco Spanish-language Assets shall be suspended if, prior to the completion of the divestitures required by this Final Judgment, those assets have been transferred to an FCC-authorized trust, and shall cease if such assets are sold under the terms of the FCC-authorized trust.

E.    In accomplishing the divestitures ordered by this Final Judgment, defendant Clear Channel promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendant Clear Channel shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and

- 8 -

documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendant Clear Channel shall make available such information to the United States at the same time that such information is made available to any other person.

F.      Defendant Clear Channel shall provide to the Acquirer or Acquirers and the United States information relating to personnel involved in the operation of the Divestiture Assets to enable the Acquirer or Acquirers to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer or Acquirers to employ any Clear Channel employee whose primary responsibility is the operation of the Divestiture Assets.

G.      Defendant Clear Channel shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

H.      Defendant Clear Channel shall warrant to the Acquirer or Acquirers that each of the assets will be operational on the date of sale.

I.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

J.      Defendant Clear Channel shall warrant to the Acquirer or Acquirers that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets, and that following the sale of the Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

K.      Unless the United States otherwise consents in writing, any divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire

Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion that (i) the Clear Channel Assets can and will be used by the Acquirer or Acquirers as part of viable, ongoing businesses engaged in ongoing commercial radio broadcasting; (ii) the Clear Channel Spanish-language Assets can and will be used by the Acquirer or Acquirers as part of viable, ongoing businesses engaged in ongoing commercial Spanish language radio broadcasting; (iii) that the Divestiture Assets will remain viable; and (iv) that the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The sale of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment:

1.     shall be made to an Acquirer or Acquirers that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the either the commercial radio broadcasting business (for the Cincinnati Assets and the Houston Assets) or the commercial Spanish-language radio broadcasting business (for the Houston Spanish-language Assets, the Las Vegas Spanish-language Assets, and the San Francisco Spanish-language Assets); and

2.     shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer or Acquirers and defendant Clear Channel gives defendant the ability to unreasonably raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. Appointment of Trustee

A.     If defendant Clear Channel has not divested the Divestiture Assets within the time period specified in Paragraph IV(A), defendants shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets.  The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Paragraph V(D) of this Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, and are reasonably necessary in the trustee's judgment to assist in the divestiture.

C.      Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance.  Any such objection by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.      The trustee shall serve at the cost and expense of the defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred.  After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to the defendants and the trust shall then be terminated.  The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.      Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture.  The trustee and any consultants, accountants, attorneys, and other persons retained by

- 11 -

the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and the defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.      After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth: (1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such report contains information that the trustee deems confidential, such report shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment,

- 12 -

which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestitures

A.     Within two (2) business days following execution of a definitive divestiture agreement, defendant Clear Channel or the trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestitures required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture(s) and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.     Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from the defendants, the proposed Acquirer or Acquirers, any other third party, or the trustee, if applicable, additional information concerning the proposed divestitures, the proposed Acquirer or Acquirers, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.     Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer or Acquirers, any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture(s). If the United States provides written notice that it does not object, the divestitures may be consummated, subject only to defendants' limited right to object to the sale under Paragraph V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon

- 13 -

objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendant Clear Channel under Paragraph V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

### VIII. Preservation of Assets/Hold Separate

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

### IX. Affidavits

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of their compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to any prospective Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information

provided by defendants, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.       Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.       Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

### X. Compliance Inspection

A.       For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1.       access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

2.       to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by any defendant.

- 15 -

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If, at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### XI. No Reacquisition

A.      As long as defendant Bain has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel and either Cumulus Media Partners or CMP Susquehanna, defendants Bain and Clear Channel may not reacquire any part of the Clear Channel Divestiture Assets nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement with respect to the Clear Channel Divestiture Assets.

B.      As long as defendant THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel and either Cumulus Media Partners or CMP Susquehanna, defendants THL and Clear Channel may not reacquire any part of the Clear

Channel Divestiture Assets nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement with respect to the Clear Channel Divestiture Assets.

C.      As long as defendant THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel and either Univision or BMP-Univision Holdings, defendants THL and Clear Channel may not reacquire any part of the Clear Channel Spanish-language Divestiture Assets nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement with respect to the Clear Channel Spanish-language Divestiture Assets.

D.      If defendants Bain and THL satisfied the requirements of Paragraph IV(B) of this Final Judgment and thus did not divest the Clear Channel Assets, no defendant may, so long as Bain or THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel, acquire any beneficial interest in either Cumulus Media Partners or CMP Susquehanna nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement between Clear Channel and Cumulus Media Partners or CMP Susquehanna with respect to radio stations in Cincinnati or Houston.

E.      If defendant THL satisfied the requirements of Paragraph IV(C) of this Final Judgment and thus did not divest the Clear Channel Spanish-language Assets, neither THL nor Clear Channel may, so long as THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel, acquire any beneficial interest in either BMP-Univision Holdings or Univision nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement between Clear Channel and BMP-Univision or Univision with respect to radio stations in Houston, Las Vegas, or San Francisco.

## XII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out

- 17 -

or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XIII.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

### XIV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____


Court approval subject to procedures of the Antitrust Procedures and Penalties Act,

15 U.S.C. § 16:



_____

United States District Judge

# UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>325 7th Street, N.W., Suite 300<br>Washington, DC 20530, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.<br><br>Filed: |
| v. | ) ) | |
| **BAIN CAPITAL, LLC**<br>111 Huntington Ave.<br>Boston, MA 02199, | ) ) ) ) | |
| and | ) ) | |
| **THOMAS H. LEE PARTNERS, L.P.**<br>100 Federal St. 35th Fl.<br>Boston, MA 02110, | ) ) ) ) | |
| and | ) ) | |
| **CLEAR CHANNEL<br>COMMUNICATIONS, INC.**<br>200 E. Basse Rd.<br>San Antonio, TX 78209, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF UNITED STATES'
## EXPLANATION OF CONSENT DECREE PROCEDURES

Plaintiff United States of America ("United States") submits this memorandum

summarizing the procedures for entry of the proposed Final Judgment as set forth by the

Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "APPA"), which applies in

civil antitrust cases brought and settled by the United States. As described below, the APPA provides that certain events must occur prior to the Court signing and entering the proposed Final Judgment to resolve this case.

1.     Today, Plaintiff has filed a Complaint, proposed Final Judgment, Competitive Impact Statement, and Hold Separate Stipulation and Order between the parties ("Stipulation and Order").

2.     Defendants have agreed in the Stipulation and Order that they will abide by the terms of the proposed Final Judgment in the interim and also follow certain procedures described in the Stipulation and Order between consummation of their merger and the divestitures required by the proposed Final Judgment. At this time, we ask that the Court sign only the Stipulation and Order.

3.     The Stipulation and Order also contains the parties' agreement that, after compliance with the APPA, the Court may enter the proposed Final Judgment. The APPA requires that Plaintiff publish the proposed Final Judgment and the Competitive Impact Statement in the *Federal Register* and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment. The notice will inform members of the public that they may submit comments about the proposed Final Judgment to the United States Department of Justice, Antitrust Division (*see* 15 U.S.C. §§ 16(b)-(c)).

4.     During the sixty-day period, Plaintiff will consider, and at the close of that period respond to, any comments that it has received, and it will publish the comments and Plaintiff's responses in the *Federal Register*.

2

5.    After the expiration of the sixty-day period, Plaintiff will file with the Court the comments and Plaintiff's responses, and Plaintiff either will ask the Court to enter the Final Judgment (subject to any proposed revisions) or will withdraw its consent to entry of the Final Judgment, as provided in Paragraph IV(A) of the Stipulation and Order (*see* 15 U.S.C. § 16(d)).

6.    If Plaintiff requests that the Court enter the Final Judgment after compliance with the APPA, 15 U.S.C. §§ 16(e)-(f), then the Court may enter the Final Judgment without a hearing, provided that the Court concludes that the Final Judgment is in the public interest.

Dated: February 13, 2008

Respectfully submitted,

FOR PLAINTIFF:

_____/s/_____

Daniel McCuaig (D.C. Bar No. 478199)
Trial Attorney
United States Department of Justice
Antitrust Division
325 7th St. NW, Suite 300
Washington, D.C. 20530
Telephone No.: 202-307-0520
Facsimile No.:  202-514-7308

3