# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>325 7th Street, N.W., Suite 300<br>Washington, DC 20530,<br><br>        Plaintiff,<br><br>        v.<br><br>**BAIN CAPITAL, LLC**<br>111 Huntington Ave.<br>Boston, MA 02199,<br><br>and<br><br>**THOMAS H. LEE PARTNERS, L.P.**<br>100 Federal St. 35th Fl.<br>Boston, MA 02110,<br><br>and<br><br>**CLEAR CHANNEL<br>COMMUNICATIONS, INC.**<br>200 E. Basse Rd.<br>San Antonio, TX 78209,<br><br>        Defendants. | Civil Action No.: 1:08-cv-00245<br><br>Filed: Feb. 13, 2008<br>Assigned to: Robertson, James<br>Assign. Date: 2/13/2008<br>Description: Antitrust |

## CERTIFICATE OF COMPLIANCE WITH PROVISIONS OF
## THE ANTITRUST PROCEDURES AND PENALTIES ACT

Plaintiff, United States of America, by its undersigned attorney, hereby certifies that, in compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA"), the following procedures have been followed in preparation for the entry of the Final Judgment in the above-captioned matter:

1.    The Complaint, Competitive Impact Statement, proposed Final Judgment, and Hold Separate Stipulation and Order ("Hold Separate Order"), by which the parties have agreed

to the Court's entry of the Final Judgment following compliance with the APPA, were filed on February 13, 2008.

2.     Pursuant to 15 U.S.C. § 16(b), the proposed Final Judgment, Hold Separate Order, and Competitive Impact Statement were published in the *Federal Register* on February 28, 2008 (73 Fed. Reg. 10808). A copy of the *Federal Register* notice is attached hereto as Exhibit 1.

3.     Pursuant to 15 U.S.C. §16(b), copies of the Complaint, Hold Separate Order, proposed Final Judgment, and Competitive Impact Statement were made available to anyone requesting them.

4.     Pursuant to 15 U.S.C. § 16(c), a summary of the terms of the proposed Final Judgment, Hold Separate Stipulation and Order, and Competitive Impact Statement was published in *The Washington Post*, a newspaper of general circulation in the District of Columbia, during a seven-day period in March 2008 (March 9th through March 15th). A copy of the Proof of Publication from *The Washington Post* is attached hereto as Exhibit 2.

5.     On June 20, 2008, defendants Bain Capital, LLC and Thomas H. Lee Partners, L.P. filed with this Court a description of their communications with employees of the United States concerning the proposed Final Judgment, as required by 15 U.S.C. § 16(g). See Exhibit 3.

6.     On July 1, 2008, defendant Clear Channel Communications, Inc. filed with this Court a description of its communications with employees of the United States concerning the proposed Final Judgment, as required by 15 U.S.C. § 16(g). See Exhibit 4.

7.     The sixty-day public comment period specified in 15 U.S.C. § 16(b) began on February 29, 2008, and ended on April 28, 2008. During that period, the United States did not receive any comments on the proposed settlement.

8.     At this stage, with the United States having published its proposed settlement and received no public comments in response, and defendants having certified their pre-settlement contacts with government officials, the parties have fulfilled their obligations under the APPA. Pursuant to the Hold Separate Stipulation and Order the Court entered on March 4, 2008 and 15 U.S.C. §16(e), this Court may now enter the Final Judgment, if it determines that the entry of the Final Judgment is in the public interest.

9.      For the reasons set forth in the Competitive Impact Statement, the United States strongly believes that the Final Judgment is in the public interest and urges the Court to enter the Final Judgment without further proceeding.

Dated: July 3, 2008

Respectfully submitted,

Christopher M. Ries
Daniel McCuaig (D.C. Bar No. 478199)
Attorneys for the United States
Litigation III Section
Antitrust Division
United States Department of Justice
450 5th Street NW, Suite 4000
Washington, DC 20530-0001

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2008, I caused copies of the foregoing Certificate of

Compliance with Provisions of the Antitrust Procedures and Penalties Act to be served on the

defendants in this matter in the manner set forth below:

By electronic mail and first class, postage prepaid U.S. Mail:

Counsel for Defendants Bain Capital, LLC and Thomas H. Lee Partners, L.P.
James M. "Mit" Spears
Ropes & Gray LLP
700 12th Street, N.W.
Suite 900
Washington, DC 20005-3948
Telephone: (202) 508-4681
Facsimile: (202) 383-8320
Email: mit.spears@ropesgray.com

Counsel for Defendant Clear Channel Communications, Inc.
Phillip A. Proger
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-4668
Facsimile: (202) 626-1700
Email: paproger@jonesday.com

Daniel McCuaig (D.C. Bar No. 478199)
United States Department of Justice
Antitrust Division, Litigation III Section
450 5th Street NW, Suite 4000
Washington, DC 20530-0001
Telephone: (202) 307-0520
Facsimile: (202) 514-7308
Email: daniel.mccuaig@usdoj.gov

# EXHIBIT 1

**DEPARTMENT OF JUSTICE**

**Antitrust Division**

**United States v. Bain Capital, LLC, Thomas H. Lee Partners, L.P., and Clear Channel Communications, Inc.; Proposed Final Judgement and Competitive Impact Statement**

Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)–(h), that a proposed Final Judgment, Hold Separate Stipulation and Order, and Competitive Impact Statement have been filed with the United States District Court for the District of Columbia in *United States of America* v. *Bain Capital, LLC,* Civil Action No. 1:08–cv–00245. On February 13, 2008, the United States filed a Complaint alleging that the proposed acquisition by Bain Capital, LLC and Thomas H. Lee Partners, L.P. of a controlling interest in Clear Channel Communications, Inc. would violate section 7 of the Clayton Act, 15 U.S.C. 18. The proposed Final Judgment, filed the same time as the Complaint, requires Clear Channel to divest radio stations in Cincinnati, Ohio; Houston, Texas; Las Vegas, Nevada; and San Francisco, California, along with certain related assets.

Copies of the Complaint, proposed Final Judgment and Competitive Impact Statement are available for inspection at the Department of Justice, Antitrust Division, Antitrust Documents Group, 325 7th Street, NW., Room 215, Washington, DC 20530 (telephone: 202–514–2481, on the Department of Justice's Web site (*http://www.usdoj.gov/atr*), and at the Office of the Clerk of the United States District Court for the District of Columbia. Copies of these materials may be obtained from the Antitrust Division upon request and payment of the coping fee set by Department of Justice regulations.

Public comment is invited within 60 days of the date of this notice. Such comments, and responses thereto, will be published in the **Federal Register** and filed with the Court. Comments should be directed to John Read, Chief, Litigation III section, Antitrust Division, Department of Justice, Washington, DC 20530 (telephone: 202–307–0462).

**Patricia A. Brink,**
*Deputy Director of Operations.*

**United States District Court for the District of Columbia**

*United States of America, Department of Justice, Antitrust Division, 325 7th Street, NW., Suite 300, Washington, DC 20530,* Plaintiff, v. *Bain Capital, LLC, 111 Huntington Ave., Boston, MA 02199,* and *Thomas H. Lee Partners, L.P., 100 Federal St. 35th Fl., Boston, MA 02110,* and *Clear Channel Communications, Inc., 200 E. Basse Rd., San Antonio, TX 78209,* Defendants.

Civil Action No. 1:08–cv–00245
Filed: Feb. 13, 2008
Assigned to: Robertson, James
Assign. Date: 2/13/2008
Description: Antitrust

**Complaint**

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the proposed acquisition of Clear Channel Communications Inc. ("Clear Channel") by a private equity group of investors led by Bain Capital, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL"), and to obtain other relief as appropriate. Plaintiff United States alleges as follows:

*I. Nature of the Action*

1. Bain and THL, two of the world's leading private investment firms, are planning to acquire, each through various affiliated funds, substantial ownership interests in Clear Channel, the largest operator of radio stations in the United States (the "transaction"). The anticipated value of the transaction is $28 billion.

2. After the transaction, Bain and THL each would control at least 35 percent of the voting interests in Clear Channel and each would designate four members to the 12 member Clear Channel Board of Directors. Together, Bain and THL would control at least 70 percent of the voting interests of Clear Channel and designate two-thirds of the members of its Board of Directors. Further, Bain and THL, either directly or indirectly through management teams they install, typically manage and operate the assets in which they invest.

3. Bain and THL, through affiliated funds and co-investment vehicles, have substantial ownership interests in Cumulus Media Partners LLC ("CMP"), another large nationwide operator of radio stations. Bain and THL each control 25 percent of the voting interests of CMP and designate two members to its eight member Board of Directors. Together, Bain and THL control 50 percent of the voting interests of CMP and designate one-half of the members of its Board of Directors. CMP operates radio stations that compete head-to-head with Clear Channel radio stations in Cincinnati, Ohio and Houston/Galveston, Texas ("Houston").

4. After the transaction, Bain and THL would have governance rights in Clear Channel and CMP sufficient to enable Bain and THL, individually or together, to control or influence the companies' competitive decisions to produce an anticompetitive outcome in markets where both Clear Channel and CMS are significant competitors. Accordingly, Bain's and THL's acquisitions of substantial partial ownership interests in Clear Channel would substantially lessen competition between Clear Channel and CMP in the sale of radio advertising in Cincinnati and Houston in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

5. THL, through affiliated funds and co-investment vehicles, currently olds a 20 percent equity interest and a 14 percent voting interest in Univision Communications, Inc. ("Univision"), a large nationwide operator of radio stations that broadcast primarily in Spanish-language format. THL designates three members to Univision's 17 member Board of Directors. Univision operates radio stations that compete head-to-head with Clear Channel's Spanish-language radio stations in Houston; Las Vegas, Nevada; and San Francisco, California.

6. After the transaction, THL would have governance rights in Clear Channel and Univision sufficient to influence the companies' competitive decisions to produce an anticompetitive outcome in markets where both Clear Channel and Univision are significant competitors. Accordingly, THL's acquisition of a substantial partial ownership interest in Clear Channel would substantially lessen competition in the sale of Spanish-language radio advertising in Houston, Las Vegas, and San Francisco in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

*II. Jurisdiction and Venue*

7. Plaintiff United States brings this action under section 15 of the Clayton Act, as amended, 15 U.S.C. 25, to prevent and restrain defendants from violating section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

8. Bain and THL, through CMP and Univision, and Clear Channel sell radio advertising to local and national advertisers, a commercial activity that substantially affects and is in the flow of interstate commerce. This court has jurisdiction over the subject matter of this action pursuant to sections 15 and 16 of the Clayton Act, 15 U.S.C. 25, 26, and 28 U.S.C. 1331, 1337.

9. Bain, THL, and Clear Channel transact business within the District of Columbia. Venue is therefore proper in this Court pursuant to 15 U.S.C. 22 and 28 U.S.C. 1391.

## III. Defendants and Other Relevant Entities

10. Clear Channel is a diversified media company incorporated in Texas and headquartered in San Antonio, Texas. Clear Channel owns various media outlets including radio stations, domestic and international outdoor advertising assets, television stations, and a media representation firm. Radio broadcasting is Clear Channel's largest business segment, representing over 50 percent of Clear Channel's total revenue. As of February 5, 2008, Clear Channel owned 833 radio stations in the United States, 508 of which were located within the top 100 markets as ranked by Arbitron, an international media marketing and research firm, including stations in Cincinnati, Houston, Las Vegas, and San Francisco.

11. Bain is a Delaware limited liability company headquartered in Boston, Massachusetts. Bain is one of the world's leading private investment firms with over $40 billion in assets under management.

12. THL is a Delaware limited partnership headquartered in Boston, Massachusetts and also is one of the world's leading private investment firms. THL currently manages approximately $12 billion of committed capital.

13. Bain and THL raise pools of capital from private investors, controlling and managing that capital through private equity funds and co-investment vehicles that invest in discrete opportunities, such as venture capital, public equity, and leveraged debt assets.

14. CMP is a limited liability company formed in 2005 that is owned by Bain, THL, Cumulus Broadcasting Inc., the Blackstone Group, and their affiliates. As of February 5, 2008, CMP owned 34 radio stations in various markets, including Cincinnati and Houston.

15. Univision is headquartered in New York City and is the largest broadcaster of Spanish-language television programming in the United States. Univision also owns 70 radio stations that broadcast in Spanish language in various markets, including Houston, Las Vegas, and San Francisco. Univision is owned and operated by five private equity firms: THL, Haim Saban, TPG Capital, Providence Equity, Madison Dearborn, and their affiliates.

## IV. The Proposed Acquisition

16. Clear Channel, Bain, and THL have agreed that funds and co-investment vehicles under the direction of Bain (collectively "Bain CC Affiliates") and funds and co-investment vehicles under the direction of THL (collectively "THL CC Affiliates") will purchase a controlling interest in Clear Channel. Under their proposal, Bain and THL each will acquire at least a 35 percent voting and economic interest in Clear Channel, with the remaining interest of up to 30 percent staying in the hands of those current Clear Channel investors and option-holders who elect to retain an equity interest in Clear Channel rather than to receive cash for their shares and/or stock options. Under the purchase arrangement, Bain and THL, through Bain CC Affiliates and THL CC Affiliates, each will also acquire the right to designate four directors of the 12 member Clear Channel Board of Directors. If the transaction is consummated, Bain and THL together will control at least 70 percent of the voting interests of Clear Channel and designated two-thirds of the members of the Board of Directors.

## V. Relevant Markets

### A. Relevant Product Markets

17. *Radio Advertising.* Radio stations employ various formats for their programming, such as Adult Contemporary, Sports, or Rock. A station's format can be important in determining the size and characteristics of its listening audience. Companies that operate radio stations, like Clear Channel, CMP, and Univision, sell advertising time to local and national advertisers in each geographic market where they operate those stations. Advertising rates charged by a radio station are based primarily on the station's ability to attract listening audiences having certain demographic characteristics in the market area that advertisers want to reach, as well as on the number of stations and the relative demand for radio in the market.

18. Many local and national advertisers purchase radio advertising time because they consider it preferable to advertising in other media to meet their specific needs. They may consider radio advertising time to be more cost-effective than other media to reach their target audiences. They may also consider radio advertising to be more efficient than other media to reach their target audiences. Additionally, radio stations render certain services or promotional opportunities to advertisers that the advertisers cannot exploit as effectively using other media. For these reasons, many local and national advertisers who purchase radio advertising time view radio as a necessary advertising medium, sometimes as a complement to other media. A substantial number of advertisers with strong radio preferences would not turn to other media if faced with a small but significant increase in the price of advertising time on radio stations.

19. Radio stations generally can identify advertisers with strong radio preferences. Radio stations also negotiate prices individually with advertisers; consequently, radio stations can charge different advertisers different prices. Because of this ability to price discriminate among customers, radio stations may charge higher prices to the substantial number of advertisers that view radio as particularly effective for their needs, while maintaining lower prices for other advertisers.

20. In the event of a price increase in radio advertising time, some local and national advertisers may switch some of their advertising to other media rather than absorb a price increase in radio advertising time. However, the existence of such advertisers would not prevent radio stations from profitably raising their prices by a small but significant amount for a substantial number of advertisers that would not switch.

21. Accordingly, the provision of advertising time on radio stations is a line of commerce and a relevant product market within the meaning of section 7 of the Clayton Act.

22. *Spanish-language Radio Advertising.* In markets with a large Hispanic population, many local and national advertisers also consider Spanish-language radio to be particularly effective or necessary to reach their desired customers, particularly consumers who listen predominantly or exclusively to Spanish-language radio. A substantial number of these advertisers consider Spanish-language radio, either alone or as complement to other media, to be the most effective way to reach their target audience, and do not consider other media, including non-Spanish-language radio, to be a reasonable substitute. These advertisers would not turn to other media, including radio that is not broadcast in Spanish, if faced with a small but significant increase in the price of advertising time on Spanish-language radio.

23. Accordingly, the provision of advertising time on Spanish-language radio stations to these advertisers is a line of commerce and a relevant product market within the meaning of section 7 of the Clayton Act.

### B. Relevant Geographic Markets

24. Local and national advertisers buy radio advertising time on Clear Channel,

CMP, and Univision radio stations within areas defined by an Arbitron Metro Survey Area ("MSA"). An MSA is the geographic unit that is widely accepted by radio stations, advertisers, and advertising agencies as the standard geographic market to use in evaluating radio audience size and composition.

25. Local and National advertising that is placed on radio stations in an MSA is aimed at reaching listening audiences in that MSA. Radio stations in other MSAs do not provide effective access to these audiences. If there were a small but significant price increase within an MSA, an insufficient number of advertisers would switch their advertising time purchases to radio stations outside the MSA to make the price increase unprofitable.

26. In the Houston and Cincinnati MSAs, Clear Channel and CMP stations compete against each other and against other stations in the provision of radio advertising time to advertisers, regardless of the language broadcast over the station. If there were a small but significant increase in radio advertising prices within the Houston or Cincinnati MSA, an insufficient number of advertisers seeking to reach listeners in the Houston or Cincinnati MSA would switch their advertising time purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Houston and Cincinnati MSAs (the "Overlap Markets") are each relevant geographic markets within the meaning of section 7 of the Clayton Act.

27. In the Houston, Las Vegas, and San Francisco MSAs, Clear Channel and Univision compete against each other in the provision of Spanish-language radio advertising time to advertisers. If there were a small but significant increase in Spanish-language radio advertising prices in the Houston, Las Vegas, or San Francisco MSAs, an insufficient number of advertisers seeking to reach listeners in the any of those MSAs would switch their Spanish-language advertising purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Houston, Las Vegas, and San Francisco MSAs (the "Spanish-language Overlap Markets") are each relevant geographic markets within the meaning of section 7 of the Clayton Act.

*VI. Harm to Competition*

A. Competition in the Relevant Geographic Markets

1. *Radio Advertising in the Overlap Markets*

28. Advertisers who use radio to reach their target audience *select radio stations on which to advertise* based upon a number of factors including, among others, the size of the station's audience and the characteristics of its audience. Many advertisers seek to reach a large percentage of their target audience by *selecting those stations* whose listening audience is highly correlated to their target audience.

29. Clear Channel and CMP vigorously compete for listeners and closely monitor each other's competitive position in the Cincinnati and Houston MSAs. Their stations are similarly formatted and programmed with an eye toward attracting listeners from each other.

30. Clear Channel and CMP stations in Houston and Cincinnati *also* currently compete vigorously for radio advertisers who seek to reach the specific demographic groups listening to their stations. For many local and national advertisers buying radio advertising time in the Houston and Cincinnati markets, Clear Channel and CMP stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers who desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and CMP stations against each other to reach better terms.

31. Radio station ownership in Houston and Cincinnati is highly concentrated, with Clear Channel and CMP's combined listener share exceeding 34 percent in Houston and 59 percent in Cincinnati. Additionally, Clear Channel and CMP's combined advertising revenue share exceeds 37 percent in Houston and 65 percent in Cincinnati.

32. Using a measure of market concentration called the Herfindahl-Hirschman Index ('HHI"), explained in Appendix A annexed hereto, concentration in these markets would increase significantly as a result of the acquisition, with post-acquisition HHIs of approximately 2,100 in Houston and approximately 4,700 in Cincinnati, well above the 1,800 threshold at which the Department normally considers a market to be highly concentrated.

2. *Spanish-Language Radio Advertising Overlap Markets*

33. Clear Channel and Univision are currently vigorous competitors and closely monitor each other's competitive position for Spanish-language listeners in the Houston, Las Vegas, and San Francisco MSAs, each of which has a large Hispanic population. Their stations in these markets are similarly formatted and programmed with an eye toward attracting Spanish-language listeners from each other.

34. Clear Channel and Univision stations also currently compete vigorously for radio advertisers who seek to reach Spanish-language listeners. For many local and national advertisers buying Spanish-language radio advertising time in the Houston, Las Vegas, and San Francisco Spanish-language Overlap Markets, Clear Channel and Univision stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers who desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and Univision stations against each other to reach better terms.

35. Spanish-language radio station ownership in Houston, Las Vegas, and San Francisco is highly concentrated. Clear Channel and Univision's combined Spanish-language listener share exceeds 75 percent in Houston, 73 percent in Las Vegas, and 70 percent in San Francisco. Additionally, Clear Channel and Univision's combined Spanish-language advertising revenue share exceeds 79 percent in Houston, 78 percent in Las Vegas, and 63 percent in San Francisco.

36. Using the Herfindahl-Hirschman Index, concentration in these markets would increase significantly as a result of the acquisition, with post-acquisition HHIs exceeding 6,500 in all three markets, well above the 1,800 threshold at which the Department normally considers a market to be highly concentrated.

B. This Acquisition Would Substantially Lessen Competition

1. *Radio Advertising in Houston and Cincinnati*

37. Clear Channel is one of only a few radio companies competing with CMP in the sale of radio advertising in Houston and Cincinnati, and within those markets, the two companies are each other's next best substitutes for advertisers seeking to reach several key demographic groups. Bain and THL together possess the ability to control CMP; they hold 50 percent of the voting and equity interests and have the right to choose half of the members of its Board of Directors. CMP's Board of Directors cannot make decisions without the agreement of either Bain or THL, which also have access to CMP's non-public, competitively sensitive information and its officers and employees. These ownership interests and associated rights give each of Bain and THL, as well as Bain and THL acting together, influence over, if not outright control of, CMP's management decisions.

Federal Register / Vol. 73, No. 40 / Thursday, February 28, 2008 / Notices    **10811**

38. Upon consummation of their proposed acquisition of interests in Clear Channel, defendants Bain and THL together would also control Clear Channel. Together, they would own at least 70 percent of the equity and voting interests of Clear Channel and have the right to select eight of Clear Channel's 12 directors. In addition, Bain and THL would have access to Clear Channel's non-public, competitively sensitive information and to the company's officers and employees. After the acquisition, each of Bain and THL, as well as Bain and THL acting together, would have influence over, if not outright control of, Clear Channel's management decisions.

39. Bain or THL, or Bain and THL acting together, would have the incentive and ability to use their ownership, control and influence, and access to information as to both Clear Channel and CMP to reduce competition between the companies in markets where they are significant competitors, resulting in an increase in prices for a significant number of advertisers. The Houston and Cincinnati radio markets are highly concentrated, and these advertisers will find it difficult or impossible to "buy around" Clear Channel and CMP, i.e., to effectively reach their targeted audience without using Clear Channel or CMP radio stations. Thus, Bain and THL's proposed acquisitions of ownership interests in Clear Channel, if consummated, would substantially reduce competition for radio advertising in the Houston and Cincinnati markets.

2. *Spanish-language Radio Advertising*

40. Clear Channel is one of only a few radio companies competing with Univision for Spanish-language radio advertising time in Houston, Las Vegas, and San Francisco, and within those markets, the two companies are each other's next best substitutes for advertisers targeting Spanish-language listeners. THL currently has a 20 percent equity interest and a 14 percent voting interest in Univision, as well as the right to designate three Univision board members. THL also has access to Univision's non-public, competitively sensitive information and its officers and employees. Significant corporate decisions at Univision require the assent of three of its five owners. THL's ownership interest and associated rights give it influence over Univision's management decisions.

41. Upon consummation of the proposed acquisition of Clear Channel, defendant THL would own at least 35 percent of the equity and voting interest of Clear Channel, as well as a right to

choose four of its 12 directors. In addition, after the acquisition, THL would have access to Clear Channel's non-public, competitively sensitive information and its officers and employees. THL's ownership interest and associated rights would give it influence over Clear Channel's management decisions.

42. THL would have the incentive and ability to use its ownership, control and influence, and access to information as to both Clear Channel and Univision to reduce competition between the companies in markets where they are significant competitors, resulting in an increase in prices for a significant number of advertisers. The Houston, Las Vegas, and San Francisco radio markets are highly concentrated, and these advertisers will find it difficult or impossible to "buy around" Clear Channel and Univision, i.e., to effectively reach their targeted audience without using Clear Channel or Univision radio stations. Thus, THL's proposed acquisition of an ownership interest in Clear Channel, if consummated, would substantially reduce competition in the Spanish-language Overlap Markets.

C. Entry Conditions

43. Entry of new radio stations into the relevant geographic markets would not be timely, likely, or sufficient to mitigate the competitive harm likely to result from this acquisition. Entry could occur by obtaining a license for new radio spectrum or by reformatting an existing station.

44. Acquisition of new radio spectrum is highly unlikely because spectrum is a scarce and expensive commodity.

45. Reformatting by existing stations in any of the relevant geographic markets would not be sufficient to mitigate the competitive harm likely to result from this acquisition. For those stations in these markets that have large shares in other coveted demographics, a format shift solely in response to small but significant increases in price by Clear Channel, CMP, or Univision is not likely because it would not be profitable. For those radio stations that may have incentives to change formats in response to small but significant increases in price by Clear Channel, CMP, and Univision, their shift would not be sufficient to mitigate the anticompetitive effects resulting from this acquisition.

VIII. Violation Alleged

46. Each and every allegation in paragraphs 1 through 45 of this Complaint is here realleged with the

same force and effect as though said paragraphs were here set forth in full.

47. The effect of the proposed acquisition of interests in Clear Channel by Bain and THL would be to substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act.

48. Unless restrained, the transaction would likely have the following effects, among others, in the provision of radio advertising and Spanish-language radio advertising in the relevant geographic markets:

a. competition in the sale and provision of advertising on radio stations in the relevant markets would be substantially lessened or eliminated; and

b. the prices for advertising on radio stations in the relevant markets would likely increase, and the quality of services would likely decline.

IX. Requested Relief

49. The plaintiff requests:

a. That Bain's and THL's proposed acquisitions of interests in Clear Channel be adjudged to violate Section 7 of the Clayton Act;

b. That the defendants and all persons acting on their behalf be permanently enjoined and restrained from consummating the proposed acquisitions or from entering into or carrying out any agreement, understanding, or plan, the effect of which is to bring radio stations in the relevant markets under common ownership or control;

c. That the United States be awarded the costs of this action; and

d. That the United States be granted such other and further relief as the Court may deem just and proper.

Dated: February 13, 2008.

Respectfully submitted,

For Plaintiff United States:

Thomas O. Barnett (D.C. Bar No. 426840),

*Assistant Attorney General*

David L. Meyer,

*Deputy Assistant Attorney General*

Patricia A. Brink,

*Deputy Director of Operations*

John R. Read,

*Chief, Litigation III Section,*

Nina B. Hale,

*Assistant Chief, Litigation III Section*

Christopher M. Ries,

Daniel McCuaig (D.C. Bar No. 478199),

*Attorneys for the United States, Litigation III Section, Antitrust Division, United States Department of Justice, 325 7th Street, NW., Suite 300, Washington, DC 20530*

## Certificate of Service

I hereby certify that on February 13, 2008, I caused a copy of the foregoing Complaint, proposed Final Judgment, Competitive Impact Statement, Hold Separate Stipulation and Order, and Explanation of Consent Decree Procedures to be served on the defendants in this matter in the manner set forth below:

By electronic mail and hand delivery:

Counsel for Defendants Bain Capital, LLC and Thomas H. Lee Partners, L.P.,
James M. "Mit" Spears,
Ropes & Gray LLP,
*700 12th Street, NW., Suite 900, Washington, DC 20005–3948, Telephone: (202) 508–4681, Facsimile: (202) 383–8320, E-mail: mit.spears@ropesgray.com.*

Counsel for Defendant Clear Channel Communications, Inc.,
Phillip A. Proger,
Jones Day,
*51 Louisiana Avenue, NW., Washington, DC 20001–2113, Telephone: (202) 879–4668, Facsimile: (202) 626–1700, E-mail: paproger@jonesday.com.*

Daniel McCuaig (D.C. Bar No. 478199),
*United States Department of Justice, Antitrust Division, Litigation III Section, 325 Seventh Street, NW., Suite 300, Washington, DC 20530, Telephone: (202) 307–0520, Facsimile: (202) 514–7308, E-mail: daniel.mccuaig@usdoj.gov.*

## Appendix A Definition of HHI

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is $2,600 (30^2 + 30^2 + 20^2 + 20^2 = 2,600)$. The HHI takes into account the relative size and distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 when a market is controlled by a single firm. The HHI increases both as the number of firms in the market *decreases* and as the disparity in size between those firms *increases*.

Markets in which the HHI is between 1000 and 1800 are considered to be moderately concentrated, and markets in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise significant antitrust concerns under the Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines.

## United States District Court for the District of Columbia

*United States Of America, Department of Justice, Antitrust Division 325 7th Street, NW., Suite 300 Washington, DC 20530,* Plaintiff, v. *Bain Capital, LLC 111 Huntington Ave., Boston, MA 02199, and Thomas H. Lee Partners L.P., 100 Federal St. 35th Fl. Boston, Massachusetts 02110, and Clear Channel Communications Inc. 200 E. Basse Rd., San Antonio, TX 78209,* Defendants.

Civil Action No.: 1 :08-cv-00245
Filed: Feb. 13, 2008
Assigned to: Robertson, James
Assign. Date: 2/13/2008
Description: Antitrust

## Final Judgment

*Whereas,* plaintiff, United States of America, filed its Complaint on February 13, 1998, the United States and Defendants Bain Capital, LLC ("Bain"), Thomas H. Lee Partners, L.P. ("THL"), and Clear Channel, by their respective attorneys, have consulted to entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

*And whereas,* defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

*And whereas,* the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by defendants to assure that competition is not substantially lessened;

*And whereas,* the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

*And whereas,* defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

*Now therefore,* before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is *ordered, adjudged and decreed:*

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended, 15. U.S.C. 18.

## II. Definitions

As used in this Final Judgment:

A. "Bain" means Bain Capital, LLC, a Delaware limited liability company headquartered in Boston, Massachusetts, its directors, officers, partners, managers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries, partnerships, divisions, groups, affiliates, investment funds, hedge funds, and certain other private equity investment vehicles controlled or managed by Bain Capital Partners, LLC, and the respective directors, officers, general partners, managers, employees, agents, representatives, successors, and assigns of each.

B. "THL" means Thomas H. Lee Partners, L.P., a Delaware limited partnership headquartered in Boston, Massachusetts, its directors, officers, partners, managers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries, partnerships, divisions, groups, affiliates, investment funds, hedge funds, and certain other private equity investment vehicles controlled or managed by Thomas H. Lee Partners, L.P., and the respective directors, officers, general partners, managers, employees, agents, representatives, successors, and assigns of each.

C. "Clear Channel" means Clear Channel Communications, Inc., a Texas corporation headquartered in San Antonio, Texas, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents and employees.

D. "Univision" means Univision Communications, Inc., a Delaware corporation headquartered in Los Angeles, California, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E. "BMP–Univision Holdings" means Broadcasting Media Partners, Inc., a Delaware corporation headquartered in New York that holds all of Univision's outstanding shares, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

F. "CMP Susquehanna" means CMP Susquehanna Holdings, Corp., a Delaware corporation headquartered in Atlanta that is owned by Cumulus Media Partners, its directors, officers, managers, agents and employees, its

successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

G. "Cumulus Media Partners" means Cumulus Media Partners, LLC, a Delaware limited liability company headquartered in Atlanta, its directors, officers, managers, agents and employees, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

H. "MSA" means Metro Survey Area. A Metro Survey Area is a geographical area in which Arbitron, a radio industry survey company, collects listener data to aid radio stations, advertisers, and advertising agencies in evaluating radio audience size and composition.

I. "Cincinnati" means the Cincinnati, Ohio MSA.

J. "Houston" means the Houston/ Galveston, Texas MSA.

K. "Las Vegas" means the Las Vegas, Nevada MSA.

L. "San Francisco" means the San Francisco, California MSA.

M. "WLW" means the radio station WLW–AM located in Cincinnati owned by defendant Clear Channel.

N. "WKFS" means the radio station WKFS–FM located in Cincinnati owned by defendant Clear Channel.

O. "WOFX" means the radio station WOFX–FM located in Cincinnati owned by defendant Clear Channel.

P. "WNNF" means the radio station WNNF located in Cincinnati owned by defendant Clear Channel.

Q. "KLOL" means the radio station KLOL–FM located in Houston owned by defendant Clear Channel.

R. "KHMX" means the radio station KHMX–FM located in Houston owned by defendant Clear Channel.

S. "KTBZ" means the radio station KTBZ–FM located in Houston owned by defendant Clear Channel.

T. "KWID" means the radio station KWID–FM located in Las Vegas owned by defendant Clear Channel.

U. "KSJO" means the radio station KSJO–FM located in San Francisco owned by defendant Clear Channel.

V. "Cincinnati Assets" means either (1) WLW and WKFS or, at the discretion of the defendants, (2) WOFX and WNNF.

W. "Houston Assets" means either (1) KHMX or, at the discretion of the defendants, (2) KTBZ.

X. "Houston Spanish-language Assets" means KLOL.

Y. "Las Vegas Spanish-language Assets" means KWID.

Z. "San Francisco Spanish-language Assets" means KSJO.

AA. "Clear Channel Assets" means collectively, the Cincinnati Assets and the Houston Assets.

AB. "Clear Channel Spanish-language Assets" means, collectively, the Houston Spanish-language Assets, Las Vegas Spanish-language Assets, and San Francisco Spanish-language Assets.

AC. "Divestiture Assets" means all of the assets, tangible or intangible, used in the operations of the Clear Channel Assets and the Clear Channel Spanish-language Assets, including, but not limited to: (i) All licenses, permits, authorizations, and applications therefor issued by the Federal Communications Commission ("FCC") and other government agencies related to the Clear Channel Assets and the Clear Channel Spanish-language Assets; (ii) all contracts (including programming contracts and rights), agreements, leases, and commitments and understandings of defendants relating to the operations of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (iii) all interest in real property (owned or leased) relating to the transmitter facilities of the Clear Channel Assets and the Clear Channel Spanish-language Assets and all items of tangible property used in the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets at such transmitter facilities; (iv) all interest in the real property lease relating to the studios of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (v) all broadcast equipment, office equipment, office furniture, fixtures, materials, supplies, and other tangible property used in the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets; (vi) all interests in trademarks, service marks, trade names, copyrights, patents, slogans, programming materials, and promotional materials relating to the Clear Channel Assets and the Clear Channel Spanish-language Assets; (vii) all customer lists, accounts, and credit records relating to the Clear Channel Assets and the Clear Channel Spanish-language Assets; and (viii) all other records maintained by defendants in connection with the Clear Channel Assets and the Clear Channel Spanish-language Assets; however, assets that: (a) Are principally devoted to the operation of stations other than the Clear Channel Assets and the Clear Channel Spanish-language Assets or to the operation of their parent companies, and are not necessary to the operation of the Clear Channel Assets and the Clear Channel Spanish-language Assets shall not be included within the Divestiture Assets; or (b) are part of a

shared group of like assets (including, but not limited to, microphones and office supplies) shall be allocated to Clear Channel Assets and Clear Channel Spanish-language Assets, and thus to Divestiture Assets, only in proportion with their use by the Clear Channel Assets or the Clear Channel Spanish-language Assets.

AD. "Clear Channel Divestiture Assets" are the Divestiture Assets relating to the Clear Channel Assets.

AE. "Clear Channel Spanish-language Divestiture Assets" are the Divestiture Assets relating to the Clear Channel Spanish-language Assets.

AF. "Acquirer" means the entity or entities to whom defendants divest any Divestiture Assets.

*III. Applicability*

A. This Final Judgment applies to THL, Bain, and Clear Channel, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. If, prior to complying with Sections IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the acquirers of the assets divested pursuant to this Final Judgment.

*IV. Divestitures*

A. Defendant Clear Channel is ordered and directed to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole discretion, within ninety (90) calendar days from the date of the closing of the transaction that is the subject of the Final Judgment or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed in total sixty (60) calendar days, and shall notify the Court in each such circumstance. If, within the period permitted for divestitures, defendants have filed applications with the FCC seeking approval to assign or transfer licenses to the Acquirer(s) (previously approved by the United States), pursuant to the terms of this paragraph) of the Clear Channel Assets and the Clear Channel Spanish-language Assets, but an order or other dispositive action by the FCC on such applications has not been issued before the end of

the period permitted for divestitures, the period shall be extended with respect to divestiture of those Clear Channel Assets and Clear Channel Spanish-language Assets for which FCC final approval has not been issued until ten (10) calendar days after such approval is received. Defendant Clear Channel agrees to use its best efforts to divest the Divestiture Assets, and to obtain all regulatory approvals necessary for such divestitures, as expeditiously as possible.

B. The Divestiture Assets shall not include the Clear Channel Assets if, prior to the completion of the divestitures required by this Final Judgment, both THL and Bain no longer have any have limited liability company membership or any type of debt, equity governance, or other beneficial interest in either Cumulus Media Partners or CMP Susquehanna, and have provided written certification (and supporting documentation) satisfactory to the United States that they have divested all such assets.

C. The Divestiture Assets shall not include the Clear Channel Spanish-language Assets if, prior to the completion of the divestitures required by this Final Judgment, defendant THL no longer has any shares of capital stock or any type of debt, equity, governance, or other beneficial interest in either BMP-Univision Holdings or Univision, and has provided written certification (and supporting documentation) satisfactory to the United States that it has divested all such assets.

D. The obligation to divest the San Francisco Spanish-language Assets shall be suspended if, prior to the completion of the divestitures required by this Final Judgment, those assets have been transferred to an FCC-authorized trust, and shall cease if such assets are sold under the terms of the FCC-authorized trust.

E. In accomplishing the divestitures ordered by this Final Judgment, defendant Clear Channel promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendant Clear Channel shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or

work-product doctrine. Defendant Clear Channel shall make available such information to the United States at the same time that such information is made available to any other person.

F. Defendant Clear Channel shall provide to the Acquirer or Acquirers and the United States information relating to personnel involved in the operation of the Divestiture Assets to enable the Acquirer or Acquirers to make offers of employment. Defendants shall not interfere with any negotiations by the Acquirer or Acquirers to employ any Clear Channel employee whose primary responsibility is the operation of the Divestiture Assets.

G. Defendant Clear Channel shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

H. Defendant Clear Channel shall warrant to the Acquirer or Acquirers that each of the assets will be operational on the date of sale.

I. Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

J. Defendant Clear Channel shall warrant to the Acquirer or Acquirers that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets, and that following the sale of the Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

K. Unless the United States otherwise consents in writing, any divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion that (i) the Clear Channel Assets can and will be used by the Acquirer or Acquirers as part of viable, ongoing businesses engaged in ongoing commercial radio broadcasting; (ii) the Clear Channel Spanish-language Assets can and will be used by the Acquirer or Acquirers as part of viable, ongoing businesses engaged in ongoing commercial Spanish language radio broadcasting; (iii) that the Divestiture Assets will remain viable; and (iv) that

the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The sale of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment:

1. Shall be made to an Acquirer or Acquirers that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in either the commercial radio broadcasting business (for the Cincinnati Assets and the Houston Assets) or the commercial Spanish-language radio broadcasting business (for the Houston Spanish-language Assets, the Las Vegas Spanish-language Assets, and the San Francisco Spanish-language Assets); and

2. shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer or Acquirers and defendant Clear Channel gives defendant the ability to unreasonably raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

*v. Appointment of Trustee*

A. If defendant Clear Channel has not divested the Divestiture Assets within the time period specified in Paragraph IV (A), defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Paragraph V(D) of this Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, and are reasonably necessary in the trustee's judgment to assist in the divestiture.

C. Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objection by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D. The trustee shall serve at the cost and expense of the defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to the defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E. Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and the defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F. After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The

trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G. If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth: (1) The trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished; and (3) the trustee's recommendations. To the extent such report contains information that the trustee deems confidential, such report shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

### VI. Notice of Proposed Divestitures

A. Within two (2) business days following execution of a definitive divestiture agreement, defendant Clear Channel or the trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestitures required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture( s) and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B. Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from the defendants, the proposed Acquirer or Acquirers, any other third party, or the trustee, if applicable, additional information concerning the proposed divestitures, the proposed Acquirer or Acquirers, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the

United States has been provided the additional information requested from defendants, the proposed Acquirer or Acquirers, any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture(s). If the United States provides written notice that it does not object, the divestitures may be consummated, subject only to defendants' limited right to object to the sale under Paragraph V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendant Clear Channel under Paragraph V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

### VIII. Preservation of Assets/Hold Separate

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

### IX. Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of their compliance with section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to any prospective

Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

*X. Compliance Inspection*

A. For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1. Access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by any defendant.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If, at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26( c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

*XI. No Reacquisition*

A. As long as defendant Bain has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel and either Cumulus Media Partners or CMP Susquehanna, defendants Bain and Clear Channel may not reacquire any part of the Clear Channel Divestiture Assets nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement with respect to the Clear Channel Divestiture Assets.

B. As long as defendant THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel and either Cumulus Media Partners or CMP Susquehanna, defendants THL and Clear Channel may not reacquire any part of the Clear Channel Divestiture Assets nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement with respect to the Clear Channel Divestiture Assets.

C. As long as defendant THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel and making either Univision or BMP-Univision Holdings, defendants THL and Clear Channel may not reacquire any part of the Clear Channel Spanish-language Divestiture Assets nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement with respect to the Clear Channel Spanish-language Divestiture Assets.

D. If defendants Bain and THL satisfied the requirements of Paragraph IV (B) of this Final Judgment and thus did not divest the Clear Channel Assets, no defendant may, so long as Bain or THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel, acquire any beneficial interest in either Cumulus Media Partners or CMP Susquehanna nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement between Clear Channel and Cumulus Media Partners or CMP Susquehanna with respect to radio stations in Cincinnati or Houston.

E. If defendant THL satisfied the requirements of Paragraph IV(C) of this Final Judgment and thus did not divest the Clear Channel Spanish-language Assets, neither THL nor Clear Channel may, so long as THL has any limited liability company membership or debt, equity, governance, or other beneficial interest in Clear Channel, acquire any beneficial interest in either BMP-Univision Holdings or Univision nor enter into any local marketing agreement, joint sales agreement, or any other cooperative selling arrangement between Clear Channel and BMP-Univision or Univision with respect to radio stations in Houston, Las Vegas, or San Francisco.

*XII. Retention of Jurisdiction*

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

*XIII. Expiration of Final Judgment*

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

*XIV. Public Interest Determination*

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. Section 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon

Federal Register / Vol. 73, No. 40 / Thursday, February 28, 2008 / Notices　　　10817

and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _____

_____
Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. Section 16: United States District Judge.

## In the United States District Court for the District of Columbia

*United States of America, Department of Justice, Antitrust Division, 325 7th Street, NW., Suite 300, Washington, DC 20530, Plaintiff, v. Bain Capital, LLC, 111 Huntington Ave., Boston, MA 02199, and Thomas H. Lee Partners, L.P., 100 Federal St. 35th Fl., Boston, MA 02110, and Clear Channel Communications, Inc., 200 E. Basse Rd., San Antonio, TX 78209, Defendants.*

Civil Action No. 1:08–cv–00245
Filed: Feb. 13, 2008
　　Assigned to: Robertson, James
　　Assign Date: 2/13/2008
　　Description: Antitrust

## Competitive Impact Statement

Plaintiff United States of America ("United States"), pursuant to section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. 16(b)–(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

*Nature and Purpose of the Proceeding*

Defendants entered into an Agreement and Plan of Merger dated November 16, 2006, pursuant to which a private equity group of investors led by Bain Capital, LLC ("Bain") and Thomas H. Lee Partners, L.P. ("THL") will acquire a 70 percent interest in Clear Channel Communications Inc. ("Clear Channel"), the largest operator of radio stations in the United States.

Plaintiff filed a civil antitrust Complaint on February 13, 2008 seeking to enjoin the proposed acquisition of a controlling interest in Clear Channel by Bain and THL. The Complaint alleges that, because Bain and THL hold sizeable interests in two radio operators that compete with Clear Channel—Cumulus Media Partners LLC ("CMP") and Univision Communications, Inc. ("Univision")—the proposed acquisition would substantially lessen competition in the provision of radio advertising and Spanish-language radio advertising in several relevant geographic markets, in violation of section 7 of the Clayton Act, 15 U.S.C.

section 18. This loss of competition likely would result in the lessening or elimination of competition in the sale and provision of advertising on radio stations in the relevant markets, and increased prices and reduced services associated with advertising on radio stations in those relevant markets.

At the same time the Complaint was filed, plaintiff also filed a Hold Separate Stipulation and Order and a proposed Final Judgment, which, as explained more fully below, are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, defendants are required to divest radio stations in Cincinnati, Ohio; Houston/Galveston, Texas ("Houston"); Las Vegas, Nevada; and San Francisco, California (collectively, the "Divestiture Assets"). Under the Hold Separate Stipulation and Order, defendants will take certain steps to ensure that the Divestiture Assets will remain independent of and uninfluenced by defendants during the pendency of the ordered divestiture, and that competition is maintained during the pendency of the ordered divestiture.

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

*II. Description of the Events Giving Rise to the Alleged Violations*

A. Defendants, Other Relevant Entities, and the Proposed Transaction

Defendant Bain is a Delaware limited liability company headquartered in Boston, Massachusetts. Bain is one of the world's leading private investment firms with over $40 billion in assets under management. Defendant THL is a Delaware limited partnership headquartered in Boston, Massachusetts and also is one of the world's leading private investment firms. THL currently manages approximately $12 billion of committed capital. Bain and THL raise pools of capital from private investors, controlling and managing that capital through private equity funds and co-investment vehicles that invest in discrete opportunities, such as venture capital, public equity, and leveraged debt assets. Bain and THL, either directly or indirectly through management teams they install,

typically manage and operate the assets in which they invest.

Defendant Clear Channel is a diversified media company incorporated in Texas and headquartered in San Antonio, Texas. Clear Channel owns various media outlets including radio stations, domestic and international outdoor advertising assets, television stations, and a media representation firm. Radio broadcasting is Clear Channel's largest business segment, representing over 50 percent of Clear Channel's total revenue. As of February 5, 2008, Clear Channel owned 833 radio stations in the United States, 508 of which were located within the top 100 markets as ranked by Arbitron, an international media marketing and research firm, including stations in Cincinnati, Houston, Las Vegas, and San Francisco.

Bain and THL are owners, along with the Blackstone Group, Cumulus Broadcasting, Inc., and their affiliates, of CMP, a limited liability company formed in 2005. Bain and THL each control 25 percent of the voting interests of CMP and designate two members to its eight member Board of Directors. Together, Bain and THL control 50 percent of the voting interests of CMP and designate one-half of the members of its Board of Directors. As of February 5, 2008, CMP owned 34 radio stations in various markets, including stations that compete head-to-head with Clear Channel stations in Cincinnati and Houston.

THL is an owner, along with Haim Saban, TPG Capital, Providence Equity, Madison Dearborn, and their affiliates, of Univision, the largest broadcaster of Spanish-language television programming in the United States. Univision is headquartered in New York City. THL, through affiliated funds and co-investment vehicles, currently holds a 20 percent equity interest and a 14 percent voting interest in Univision and designates three members to Univision's 17 member Board of Directors. Univision owns 70 radio stations that broadcast in Spanish language in several markets, including Houston, Las Vegas, and San Francisco, where Univision radio stations compete head-to-head with Clear Channel's Spanish-language radio stations.

Bain and THL are planning to acquire, each through various affiliated funds, substantial ownership interests in Clear Channel (the "transaction"). The anticipated value of the transaction is $28 billion. Under the purchase arrangement, Bain and THL each will acquire at least a 35 percent voting and economic interest in Clear Channel, with the remaining interest of up to 30

percent staying in the hands of those current Clear Channel investors and option-holders who elect to retain an equity interest in Clear Channel rather than to receive cash for their shares and/ or stock options. Bain and THL each also will acquire the right to designate four directors of the 12 member Clear Channel Board of Directors. If the transaction is consummated, Bain and THL together will control at least 70 percent of the voting interests of Clear Channel and designate two-thirds of the members of the Board of Directors. This acquisition is the subject of the Complaint and proposed Final Judgment filed by plaintiff.

*III. The Competitive Effects of the Acquisition*

Given their existing ownership interests in CMP and Univision, the effect of Bain's and THL's acquisition of substantial partial ownership interests in Clear Channel may be to substantially lessen competition in markets in which stations owned by CMP or Univision— Houston, Cincinnati, Las Vegas, and San Francisco—compete head-to-head with Clear Channel stations.

A. Relevant Product Markets

1. *Radio Advertising is a Relevant Product Market*

Radio stations employ various formats for their programming, such as Adult Contemporary, Sports, or Rock. A station's format can be important in determining the size and characteristics of its listening audience. Companies that operate radio stations, such as Clear Channel, CMP, and Univision, sell advertising time to local and national advertisers in each geographic market where they operate those stations. Advertising rates charged by a radio station are based primarily on the station's ability to attract listening audiences having certain demographic characteristics in the market area that advertisers want to reach, as well as on the number of stations and the relative demand for radio in the market.

Many local and national advertisers purchase radio advertising time because they consider it preferable to advertising in other media to meet their specific needs. They may consider radio advertising time to be more cost-effective than other media to reach their target audiences. They may also consider radio advertising to be more efficient than other media to reach their target audiences. Additionally, radio stations render certain services or promotional opportunities to advertisers that the advertisers cannot exploit as effectively using other media. For these reasons, many local and national

advertisers that purchase radio advertising time view radio as a necessary advertising medium, sometimes as a complement to other media. A substantial number of advertisers with strong radio preferences would not turn to other media if faced with a small but significant increase in the price of advertising time on radio stations.

Radio stations generally can identify advertisers with strong radio preferences. Radio stations also negotiate prices individually with advertisers. Consequently, radio stations can charge different advertisers different prices. Because of this ability to price discriminate among customers, radio stations may charge higher prices to the substantial number of advertisers that view radio as particularly effective for their needs, while maintaining lower prices for other advertisers.

In the event of a price increase in radio advertising time, some local and national advertisers may switch some of their advertising to other media rather than absorb a price increase in radio advertising time. However, the existence of such advertisers would not prevent radio stations from profitably raising their prices by a small but significant amount for the substantial number of advertisers that would not switch.

Accordingly, the Complaint alleges that the provision of advertising time on radio stations is a line of commerce and a relevant product market within the meaning of section 7 of the Clayton Act.

2. *Spanish-language Radio Advertising is a Relevant Product Market*

In markets with a large Hispanic population, many local and national advertisers also consider Spanish-language radio to be particularly effective or necessary to reach their desired customers, especially consumers who listen predominantly or exclusively to Spanish-language radio. A substantial number of these advertisers consider Spanish-language radio, either alone or as a complement to other media, to be the most effective way to reach their target audience, and do not consider other media, including non-Spanish-language radio, to be a reasonable substitute. These advertisers would not turn to other media, including radio that is broadcast in a language other than Spanish, if faced with a small but significant increase in the price of advertising time on Spanish-language radio.

Accordingly, the Complaint alleges that the provision of advertising time on Spanish-language radio stations to these advertisers is a line of commerce and a

relevant product market within the meaning of section 7 of the Clayton Act.

B. Relevant Geographic Markets

Local and national advertisers buy radio advertising time on stations within areas defined by an Arbitron Metro Survey Area ("MSA"). An MSA is the geographic unit that is widely accepted by radio stations, advertisers, and advertising agencies as the standard geographic market to use in evaluating radio audience size and composition.

Local and national advertising that is placed on radio stations in an MSA is aimed at reaching listening audiences in that MSA. Radio stations in other MSAs do not provide effective access to these audiences. If there were a small but significant price increase within an MSA, an insufficient number of advertisers would switch their advertising time purchases to radio stations outside the MSA to make the price increase unprofitable.

In the Houston and Cincinnati MSAs, Clear Channel and CMP stations compete against each other and against other stations in the provision of radio advertising time to advertisers, regardless of the language broadcast over the station. If there were a small but significant increase in radio advertising prices within the Houston MSA or the Cincinnati MSA, an insufficient number of advertisers seeking to reach listeners in the Houston MSA or the Cincinnati MSA would switch their advertising time purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Complaint alleges that the Houston and Cincinnati MSAs (the "Overlap Markets") are each relevant geographic markets within the meaning of section 7 of the Clayton Act.

In the Houston MSA, Las Vegas MSA, and San Francisco MSA, Clear Channel and Univision compete against each other in the provision of Spanish-language radio advertising time to advertisers. If there were a small but significant increase in Spanish-language radio advertising prices in the Houston MSA, Las Vegas MSA, or San Francisco MSA, an insufficient number of advertisers seeking to reach listeners in any of those MSAs would switch their Spanish-language advertising purchases to radio stations outside that MSA to make the price increase unprofitable. Accordingly, the Complaint alleges that the Houston, Las Vegas, and San Francisco MSAs (the "Spanish-language Overlap Markets") are each relevant geographic markets within the meaning of Section 7 of the Clayton Act.

Federal Register / Vol. 73, No. 40 / Thursday, February 28, 2008 / Notices     10819

## C. Competition in the Relevant Markets

### 1. Competition in Radio Advertising in Houston and Cincinnati.

Advertisers that use radio to reach their target audience select radio stations on which to advertise based upon a number of factors including, among others, the size and characteristics of the station's audience. Many advertisers seek to reach a large percentage of their target audience by selecting those stations with a listening audience that is highly correlated to the advertisers' target audience.

Clear Channel and CMP vigorously compete for listeners and closely monitor each other's competitive position in the Cincinnati MSA and the Houston MSA. Their stations are similarly formatted and programmed with an eye toward attracting listeners from each other.

Clear Channel and CMP stations in Houston and Cincinnati also currently compete vigorously for radio advertisers that seek to reach the specific demographic groups listening to their stations. For many local and national advertisers buying radio advertising time in the Houston MSA and the Cincinnati MSA, Clear Channel and CMP stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers that desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and CMP stations against each other to reach better terms.

Radio station ownership in Houston and Cincinnati is highly concentrated, with Clear Channel and CMP's combined advertising revenue share exceeding 37 percent in Houston and 65 percent in Cincinnati. Additionally, Clear Channel and CMP's combined listener share exceeds 34 percent in Houston and 59 percent in Cincinnati.

### 2. Competition in Spanish-language Radio Advertising in Houston, Las Vegas, and San Francisco

Clear Channel and Univision currently are vigorous competitors and closely monitor each other's competitive position for Spanish-language listeners in the Houston, Las Vegas, and San Francisco MSAs, each of which has a large Hispanic population. Their stations in these markets are similarly formatted and programmed with an eye toward attracting Spanish-language listeners from each other.

Clear Channel and Univision stations also currently compete vigorously for radio advertisers that seek to reach Spanish-language listeners. For many local and national advertisers, buying Spanish-language radio advertising time in the Houston, Las Vegas, and San Francisco Spanish-language Overlap Markets, Clear Channel and Univision stations are each other's next best substitutes. During individualized rate negotiations, the substantial number of advertisers that desire to reach these listeners can benefit from this competition by "playing off" Clear Channel and Univision stations against each other to reach better terms.

Spanish-language radio station ownership in Houston, Las Vegas, and San Francisco is highly concentrated. Clear Channel and Univision's combined Spanish-language listener share exceeds 75 percent in Houston, 73 percent in Las Vegas, and 70 percent in San Francisco. Additionally, Clear Channel and Univision's combined Spanish-language advertising revenue share exceeds 79 percent in Houston, 78 percent in Las Vegas, and 63 percent in San Francisco.

### D. Anticompetitive Effects of the Transaction in Houston and Cincinnati Radio Advertising Markets

Clear Channel is one of only a few radio companies competing with CMP in the sale of radio advertising in Houston and Cincinnati, and within those markets, the two companies are each other's next best substitutes for advertisers seeking to reach several key demographic groups. Bain and THL currently control CMP; together they hold 50 percent of the voting and equity interests and have the right to choose half of the members of its Board of Directors. CMP's Board of Directors cannot make decisions without the agreement of either Bain or THL, which have access to CMP's non-public, competitively sensitive information and its officers and employees. These ownership interests and associated rights give each of Bain and THL, as well as Bain and THL acting together, influence over, if not outright control of, CMP's management decisions.

Upon consummation of their proposed acquisition of interests in Clear Channel, defendants Bain and THL together would also control Clear Channel. Together, they would own at least 70 percent of the equity and voting interests of Clear Channel and have the right to select eight of Clear Channel's 12 directors. In addition, Bain and THL would have access to Clear Channel's non-public, competitively sensitive information and its officers and employees. After the acquisition, each of Bain and THL, as well as Bain and THL acting together, would have influence over, if not outright control of, Clear Channel's management decisions.

Bain and THL, either directly or indirectly through management teams they install, typically manage and operate the assets in which they invest. As significant equity holders in both Clear Channel and CMP, Bain and THL each would seek to maximize the value of their investments by increasing the profitability of those companies. With respect to their interests in CMP and Clear Channel, Bain and THL's interests would be aligned and they would be expected to work together to achieve maximum profits at the two companies, including by using their control, influence, and access to information to reduce competition between Clear Channel and CMP in order to increase the companies' total profits.

Bain or THL, or Bain and THL acting together, would have the incentive and ability to use their ownership, control and influence, and access to information as to both Clear Channel and CMP to reduce competition between the companies in markets where they are significant competitors. They could accomplish such a reduction in competition in at least four ways:

(1) Through their control of or influence over both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could cause Clear Channel and CMP to coordinate their competitive behavior in a manner that increased both companies' profits but harmed consumers;

(2) Through their governance rights relating to both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could install a management team at one of the companies motivated to act in the interest of Bain and THL, and thereby reduce the vigor of its competition against the other company in which Bain and THL had a significant stake;

(3) Through their access to non-public, competitively sensitive information of both Clear Channel and CMP, and through their contacts with management at both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could facilitate coordination between Clear Channel and CMP; and

(4) Through their control of or influence over both Clear Channel and CMP, Bain or THL, or Bain and THL working together, could cause either Clear Channel or CMP to forbear from competing against the other, knowing that a significant portion of lost sales would be recaptured by a company in which Bain and THL had a significant ownership interest.

For example, Clear Channel's management team, acting pursuant to either Bain's or THL's corporate

influence, or pursuant to their joint voting control, could be expected to increase the price of advertising at Clear Channel to those advertisers that view CMP as Clear Channel's closest alternative, knowing that Bain and THL would reap the benefits of the price increase at Clear Channel and recapture the lost profits from any advertisers that chose to switch to CMP. Alternatively, the transaction would result in higher prices for purchasers of radio advertising if management teams at Clear Channel and CMP, acting pursuant to either Bain's or THL's influence or their joint voting control, were to go along with price increases at the other's stations, which would be known to Bain and THL even if not publicly disclosed. Given that Houston and Cincinnati are highly concentrated markets, advertisers would find it difficult or impossible to "buy around" Clear Channel and CMP, i.e., to effectively reach their targeted audience without using Clear Channel or CMP radio stations.

Thus, the Complaint alleges that Bain's and THL's proposed acquisitions of ownership interests in Clear Channel, if consummated, would substantially reduce competition for radio advertising in the Houston and Cincinnati Overlap Markets.

E. Anticompetitive Effects of the Acquisition in Houston, Las Vegas, and San Francisco Spanish-Language Radio Markets

Clear Channel is one of only a few radio companies competing with Univision for Spanish-language radio advertising time in Houston, Las Vegas, and San Francisco, and within those markets, the two companies are each other's next best substitutes for advertisers targeting Spanish-language listeners. THL currently has a 20 percent equity interest and a 14 percent voting interest in Univision, as well as the right to designate three Univision board members. THL also has access to Univision's non-public, competitively sensitive information and its officers and employees. Significant corporate decisions at Univision require the assent of three of its five owners. THL's ownership interest and associated rights give it influence over Univision's management decisions.

Upon consummation of the proposed acquisition of Clear Channel, defendant THL would own at least 35 percent of the equity and voting interest of Clear Channel, as well as a right to choose four of its 12 directors. In addition, after the acquisition, THL would have access to Clear Channel's non-public, competitively sensitive information and

its officers and employees. THL's ownership interest and associated rights would give it influence over Clear Channel's management decisions.

As a significant equity holder in both Clear Channel and Univision, THL would seek to maximize the value of its investments by increasing the profitability of those companies. THL likely would work to achieve maximum profits at the two companies, including by using its influence and access to information to reduce competition between Clear Channel and Univision, in order to increase THL's total profits.

THL would have the incentive and ability to use its ownership, control and influence, and access to information as to both Clear Channel and Univision to reduce competition between the companies in markets where they are significant competitors. THL could accomplish such a reduction in competition in at least four ways:

(1) Through its influence over both Clear Channel and Univision, THL could cause Clear Channel and Univision to coordinate their competitive behavior in a manner that increased both companies' profits but harmed consumers;

(2) Through its governance rights relating to both Clear Channel and Univision, THL could work to install a management team at one of the companies motivated to act in THL's interests, or influence a management team to account for THL's interests, and thereby reduce the vigor of its competition against the other company in which THL had a significant stake;

(3) Through its access to non-public, competitively sensitive information of both Clear Channel and Univision, and through its contacts with management at both Clear Channel and Univision, THL could facilitate coordination between Clear Channel and Univision; and

(4) Through its influence over both Clear Channel and Univision, THL could cause either Clear Channel or Univision to forbear from competing against the other, knowing that a significant portion of lost sales would be recaptured by a company in which THL had a significant ownership interest.

For example, as a result of the acquisition, with access to both companies' non-public competitively sensitive information, THL would have the ability and the incentive to facilitate the coordination of pricing and other competitive decisions between Clear Channel and Univision in the Spanish-language Overlap Markets. Given that those markets are highly concentrated, advertisers would find it difficult or impossible to "buy around" Clear Channel and Univision, i.e., to

effectively reach their targeted audience without using Clear Channel or Univision radio stations, resulting in higher prices and lower service levels for purchasers of Spanish-language radio advertising. Thus, the Complaint alleges that THL's acquisition of a substantial partial ownership interest in Clear Channel would substantially lessen competition in the sale of Spanish-language radio advertising in Houston, Las Vegas, and San Francisco, in violation of section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

F. Federal Communication Commission Obligations

In order to meet FCC radio ownership rules, Bain and THL, prior to consummating their acquisition of ownerships interests in Clear Channel, plan to convert all of their governance rights and ownership interests in CMP into passive equity interests, which means they will no longer have voting rights and will withdraw all Bain and THL directors from the CMP Board. For the same reason, THL likewise plans to convert its interests in Univision to passive equity interests, and withdraw from the Univision Board.

Such changes would not eliminate the potential for the competitive harm in the markets where Clear Channel competes with CMP or Univision. Because the FCC-required conversions would not reduce the magnitude of any defendant's equity stake in the three companies, the defendants would still profit from any reduction in competition between either Clear Channel and CMP or between Clear Channel and Univision. In addition, the FCC-required conversions would not affect Bain or THL's control of Clear Channel, or eliminate their access to non-public, confidential information and officers and employees at Clear Channel, CMP, and Univision.

As a result, the conversions would not eliminate the ability of Bain and THL, whether acting individually or together, to cause a reduction in competition. For example, Bain and/or THL would still have the incentive and ability, given their combined 70 percent share in Clear Channel, to influence Clear Channel's management team to increase the price of advertising at Clear Channel to those advertisers that view CMP as Clear Channel's closest alternative, knowing that Bain and THL would reap the benefits of the price increase at Clear Channel and recapture the lost profits from any advertisers that chose to switch to CMP. Alternatively, because the FCC regulatory scheme does not require that THL relinquish its access to non-public, confidential information at

either Clear Channel or Univision, THL could still have the ability to be an information conduit between the two companies so as to facilitate the coordination of pricing and other competitive decisions between them in the Spanish-language Overlap Markets. Accordingly, a decree mandating divestitures is necessary to restore competition.

G. Entry Will Not Mitigate the Likely Anticompetitive Effects

Successful entry into the Houston or Cincinnati Overlap Markets or the Houston, Las Vegas, or San Francisco Spanish-language Overlap Markets would not be timely, likely, or sufficient to offset the anticompetitive effects resulting from this transaction.

Entry could occur by obtaining a license for new radio spectrum or by reformatting an existing station. However, acquisition of new radio spectrum is highly unlikely because spectrum is a scarce and expensive commodity. Reformatting by existing stations in any of the relevant geographic markets would not be sufficient to mitigate the competitive harm likely to result from this acquisition. For those stations in these markets that have large shares in other coveted demographics, a format shift solely in response to small but significant increases in price by Clear Channel, CMP, or Univision is not likely because it would not be profitable. For those radio stations that may have incentives to change formats in response to small but significant increases in price by Clear Channel, CMP, and Univision, their shift would not be sufficient to mitigate the anticompetitive effects resulting from this acquisition.

IV. Explanation of the Proposed Final Judgment

A. Clear Channel Radio Stations Must Be Divested

The proposed Final Judgment will eliminate the anticompetitive effects that would result from Bain's and THL's acquisition of substantial ownership interests in Clear Channel. Paragraph IV(A) of the proposed Final Judgment requires defendant Clear Channel, within 90 days after the closing of their transaction, or five calendar days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest certain of its radio stations in Houston, Cincinnati, Las Vegas, and San Francisco. In order to maximize the likelihood that appropriate radio stations are divested promptly to qualified buyers, the proposed Final

Judgment provides Clear Channel with the flexibility to choose between two equivalently effective divestiture packages in Houston and Cincinnati.

The Divestiture Assets comprise the following stations and all tangible and intangible assets used in their operation:

1. the Clear Channel Assets are:

a. a Houston station—either KHMX or, at the discretion of the defendants, KTBZ;

b. two Cincinnati stations—either WLW and WKFS or, at the discretion of the defendants, WOFX and WNNF;

2. the Clear Channel Spanish-language Assets are:

a. KLOL, a Houston Spanish-language station;

b. KWID, a Las Vegas Spanish-language station; and

c. KSJO, a San Francisco Spanish-language station.

These stations must be divested to acquirer(s) that, in the United States' sole judgment, will use them as part of viable, ongoing businesses engaged in commercial radio broadcasting or Spanish-language radio broadcasting. The proposed Final Judgment requires defendants to take all reasonable steps necessary to accomplish the divestiture quickly and to cooperate with prospective acquirers.

The sale of the Divestiture Assets according to the terms of the proposed Final Judgment will eliminate the anti-competitive effects of the acquisition in the Houston and Cincinnati Overlap Markets for radio advertising and in the Houston, Las Vegas, and San Francisco Spanish-language Overlap Markets for Spanish-language radio advertising. In each market, the divestitures will establish a new, independent, and economically viable competitor.

The proposed Final Judgment relieves the defendants of some or all of their obligations to divest under three sets of circumstances. First, the proposed Final Judgment takes into account that the FCC has required that Clear Channel sell a San Francisco station in order to comply with FCC media ownership limitations. Paragraph IV(D) of the proposed Final Judgment thus provides that, if the San Francisco station has been transferred to an FCC-authorized trust prior to the completion of the required divestitures, defendants' obligation to divest that station is suspended and will be eliminated if the station is sold under the terms of the FCC-authorized trust, in which case the objectives of the proposed Final Judgment would have been achieved.

Second, if Bain and THL both divest 100 percent of their interests in CMP, thereby eliminating the overlap between CMP and Clear Channel achieved by the

transaction, Paragraph IV(B) of the proposed Final Judgment would no longer require that the defendants divest those stations that comprise the Clear Channel Assets. If these assets are not divested, Paragraph XI(D) of the proposed Final Judgment would bar the reacquisition by Bain or THL of any interest in CMP so long as they continue to have some interest in Clear Channel.

Third, if THL divests 100 percent of its interests in Univision, thereby eliminating the overlap between Univision and Clear Channel achieved by the transaction, Paragraph IV(C) of the proposed Final Judgment would no longer require that the defendants divest those stations that comprise the Clear Channel Spanish-language Assets. If these assets are not divested, however, Paragraph XI(E) of the proposed Final Judgment would bar the reacquisition of by THL of any interest in Univision so long as it continues to have some interest in Clear Channel.

B. Timing of Divestitures

In antitrust cases involving mergers or joint ventures in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. As noted above, the proposed Final Judgment requires defendant Clear Channel to complete the divestitures within 90 days after the transaction closes, or five calendar days after notice of the entry of the Final Judgment by the Court, whichever is later. The United States in its sole discretion may extend the time period for divestiture by up to 60 days.

In this matter, Paragraph IV(A) of the proposed Final Judgment also provides for an additional extension in certain circumstances. This extension takes into account the FCC's role in connection with transfers of radio stations from one operator to another. If the defendants have found a buyer or buyers for the assets (and the buyers have been approved by the United States) and have filed applications with the FCC seeking approval to assign or transfer the licenses within the initial period for divestiture, but the FCC has not yet issued a final order approving such transfers, the proposed Final Judgment allows for an extension of the divestiture period until ten days after the FCC's order approving the transfer is issued.

The divestiture timing provisions of the proposed Final Judgment will ensure that the divestitures are carried out in a timely manner, and at the same time will permit defendants an adequate opportunity to accomplish the

divestitures consistent with their FCC obligations. Even if the Clear Channel stations have not been divested upon consummation of the transaction, there should be no adverse impact on competition given the limited duration of the period of common ownership and the detailed requirements of the Hold Separate Stipulation and Order.

### C. Use of a Trustee

In the event that the defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by plaintiff to effect the divestiture.

Section V details the requirements for the establishment of the divestiture trust, the selection and compensation of the trustee, and the responsibilities of the trustee in connection with the divestiture. The trustee will have the sole responsibility, under Paragraph V(B), for the sale of the stations to be divested. The trustee has the authority to accomplish the divestiture at the earliest possible time and "at such price and on such terms as are then obtainable upon reasonable effort by the trustee."

The proposed Final Judgment provides that defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured, under Paragraph V(D) of the proposed Final Judgment, so as to provide an incentive for the trustee based on the price and terms obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and plaintiff setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and plaintiff will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the Final Judgment, including extending the trust or term of the trustee's appointment.

### D. The Hold Separate Stipulation and Order

The Hold Separate Stipulation and Order, filed at the same time as the Complaint, ensures that, pending divestiture of the Clear Channel stations, (i) defendants will take no steps to limit those stations' ability to operate as competitively independent, economically viable, and ongoing business concerns, (ii) defendants will not influence those stations' business, and (iii) competition will be

maintained. The Hold Separate Stipulation and Order requires Clear Channel to hold the stations to be divested separate as independent, ongoing, economically viable, and active competitors in their particular markets. This means that their management, including decision-making functions relating to marketing and pricing, will be kept separate and apart from, and not influenced by, defendants Bain or THL or Clear Channel's other operations.

### V. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against defendants.

### VI. Procedures Available for Modification of the Proposed Final Judgment

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to plaintiff written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the **Federal Register** or the last date of publication in a newspaper of the summary of this Competitive Impact Statement; whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of plaintiff will be filed with the Court and published in the **Federal Register**.

Written comments should be submitted to: John R. Read, Chief, Litigation III Section, Antitrust Division, U.S. Department of Justice, 325 7th Street, NW., Suite 300, Washington, DC 20530.

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

### VII. Alternatives to the Proposed Final Judgment

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against Bain and THL's acquisition of Clear Channel. Plaintiff is satisfied, however, that the divestiture of the stations described in the proposed Final Judgment will preserve competition in the provision of radio advertising in Houston and Cincinnati, and competition in the provision of Spanish-language radio advertising in Houston, Las Vegas and San Francisco, the relevant markets identified in the Complaint. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

### VIII. Standard of Review Under the APPA for the Proposed Final Judgment

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A) The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) The impact of entry of such judgment upon competition in the relevant market or markets, upon the

public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one, as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States* v. *Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States* v. *SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[1]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States* v. *BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States* v. *Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62; *United States* v. *Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular *decree* is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In

determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States* v. *Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States* v. *Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States* v. *Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland* v. *United States*, 460 U.S. 1001 (1983); *see also United States* v. *Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D.N.Y. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that

"the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459–60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

*IX. Determinative Documents*

There are no determinative materials or documents within the meaning of the APPA that were considered by plaintiff United States in formulating the proposed Final Judgment.

Dated: February 13, 2008
Respectfully submitted,
Daniel McCuaig (DC Bar No. 478199),
Christopher Ries,

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. 16(e) (2004), *with* 15 U.S.C. 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[2] *Cf.* BNS, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is

limited to approving or disapproving the consent decree"); *United States* v. *Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

[3] *See United States* v. *Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and *response* to comments alone"); S. Rep. No. 93–298, 93d Cong., 1st Sess., at 6 (1973) ["Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."]; *United States* v. *Mid-Am. Dairymen, Inc.*, 1977–1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ["Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should * * * carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."].

*Attorneys, Litigation III Section, Antitrust Division, U.S. Department of Justice, 325 7th Street, NW., Suite 300, Washington, DC 20530, (202) 307–0520, Facsimile: (202) 514–7308.*

[FR Doc. 08–867 Filed 2–27–08; 8:45 am]
**BILLING CODE 4410–11–M**

## DEPARTMENT OF LABOR

### Office of the Secretary

### Submission for OMB Review: Comment Request

February 22, 2008.

The Department of Labor (DOL) hereby announces the submission of the following public information collection requests (ICR) to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. chapter 35). A copy of each ICR, with applicable supporting documentation; including among other things a description of the likely respondents, proposed frequency of response, and estimated total burden may be obtained from the RegInfo.gov Web site at *http://www.reginfo.gov/ public/do/PRAMain* or by contacting Darrin King on 202–693–4129 (this is not a toll-free number) / e-mail: *king.darrin@dol.gov.*

Interested parties are encouraged to send comments to the Office of Information and Regulatory Affairs, Attn: Katherine Astrich, OMB Desk Officer for the Employment and Training Administration (ETA), Office of Management and Budget, Room 10235, Washington, DC 20503, Telephone: 202–395–7316/Fax: 202–395–6974 (these are not a toll-free numbers), e-mail: *OIRA_submission@omb.eop.gov* within 30 days from the date of this publication in the **Federal Register**. In order to ensure the appropriate consideration, comments should reference the OMB Control Number (see below).

The OMB is particularly interested in comments which:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

*Agency:* Employment and Training Administration.

*Type of Review:* Extension without change of a currently approved collection.

*Title:* Interstate Arrangement for Combining Employment and Wages.

*OMB Control Number:* 1205–0029.

*Form Number:* ETA–586.

*Affected Public:* State Governments.

*Estimated Number of Respondents:* 53.

*Estimated Total Annual Burden Hours:* 848.

*Estimated Total Annual Costs Burden:* $0.

*Description:* Section 3304(a)(9)(B), of the Internal Revenue Code of 1986, requires states to participate in an arrangement for combining employment and wages covered under the different state laws for the purpose of determining unemployed workers' entitlement to unemployment compensation. The Interstate Arrangement for Combining Employment and Wages for combined wage claims (CWC), promulgated at 20 CFR 616, requires the prompt transfer of all relevant and available employment and wage data between states upon request. The Benefit Payment Promptness Standard, 20 CFR part 640, requires the prompt payment of *unemployment compensation* including benefits paid under the CWC arrangement. The ETA–586 report provides the ETA/Office of Workforce Security with information necessary to measure the scope and effect of the CWC program and monitor the performance of each state in responding to wage transfer data requests and the payment of benefits. For additional information, see related notice published at 72 FR 68594 on December 5, 2007.

*Agency:* Employment and Training Administration.

*Type of Review:* New Collection (Request for a new OMB Control Number).

*Title:* High Growth and Community-Based Job Training Grants.

*OMB Control Number:* 1205–0NEW.

*Form Number:* ETA–9134.

*Affected Public:* Private Sector: Not-for-profit institutions.

*Estimated Number of Respondents:* 272.

*Estimated Total Annual Burden Hours:* 53,464.

*Estimated Total Annual Costs Burden:* $0.

*Description:* This information collection request is to implement new reporting requirements for ETA's High Growth Job Training Initiative (HGJTI) and the Community-Based Job Training Grants (CBJTG). ETA will require grantees to submit standardized quarterly reports summarizing the number and types of participants served by grantees, the number of exiters, the number of participants engaged in training activities, and some participant outcomes. To calculate the common measures for each grantee and for the program as a whole, ETA will also require grantees to submit quarterly participant records for exiters that contain the minimum number of elements needed to obtain the information to calculate the common measures. ETA plans to use these records to obtain wage record information from the Wage Record Interchange System (WRIS), which in turn ETA will use to compute common measures. These reports and records will help ETA gauge the effects of the HGJTI and CBJTG grants, identify grantees that could serve as useful models, and target technical assistance appropriately. ETA's statutory and regulatory authority to administer these programs includes provisions for the requirement of performance reporting from grantees. The legislative authority for these programs comes from the Workforce Investment Act (29 U.S.C. 2801 et seq.) and the American Competitiveness in the Twenty-first Century Act of 2000 as amended, both of which authorize and/or require that ETA collect information from grantees regarding program performance and participant outcomes.

**Darrin A. King,**

*Acting Departmental Clearance Officer.*

[FR Doc. E8–3740 Filed 2–27–08; 8:45 am]
**BILLING CODE 4510–FM–P**

## DEPARTMENT OF LABOR

### Employment and Training Administration

### Request for Certification of Compliance—Rural Industrialization Loan and Grant Program

**AGENCY:** Employment and Training Administration, Labor.

**ACTION:** Notice.

**SUMMARY:** The Employment and Training Administration is issuing this

# EXHIBIT 2

Ad # 10324781    Name US DEPT OF JUSTICE/ANTI TRUS ATTN:  MAUR    Size 66 Lines                    T0001
Class 830   PO# 1:08-cv-00245   Authorized by Sabrina Brown                    Account 1010122583

PROOF OF PUBLICATION

District of Columbia, ss., Personally appeared before me, a Notary Public in and for the
said District, Nicole McKinney well known to me to be Billing Manager
of The Washington Post, a daily newspaper published in the City of Washington,
District of Columbia, and making oath in due form of law that an advertisement containing
the language annexed hereto was published in said newspaper on the dates mentioned in the
certificate herein.

I Hereby Certify that the attached advertisement was published in
*The Washington Post*, a daily newspaper, upon the following date(s) at a cost of $4,165.36
and was circulated in the Washington metropolitan area.

Published 7 time(s). Date(s):09,10,11,12,13,14 and 15 of March 2008

Account 1010122583

Witness my hand and official seal this _____ day of _____ 20____

My commission expires _____

----------------------------------------------------------------------------------

DEPARTMENT OF JUSTICE
Antitrust Division  TAKE
*NOTICE that a proposed*
Final Judgment has been
filed in a civil antitrust
case, United States of
America v. Bain Capital,
LLC, Civil Action No. 1:08-
cv-00245.  On February 13,
2008, the United States
filed a Complaint alleging
that the proposed
acquisition by Bain
Capital, LLC and Thomas H.
Lee Partners, L.P. of a
controlling interest in
Clear Channel
Communications, Inc. would
violate Section 7 of the
*Clayton Act*, 15 *U.S.C.* §
18.  The proposed Final
Judgment, filed the same
time as the Complaint,
requires Clear Channel to
divest radio stations in
Cincinnati, Ohio; Houston,
Texas; Las Vegas, Nevada;
and San Francisco,
California, along with
certain related assets.  A
Competitive Impact

NICOLE MONTGOMERY FADDEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires Dec. 31, 2011

Ad # 10324781    Name US DEPT OF JUSTICE/ANTI TRUS ATTN:  MAUR    Size 66 Lines                    T0002
Class 830    PO# 1:08-cv-00245    Authorized by Sabrina Brown                  Account 1010122583

Statement filed by the
United States describes
the Complaint, the
proposed Final Judgment,
the industry, and the
remedies available to
private litigants who may
have been injured by the
alleged violation. Copies
of the Complaint, proposed
Final Judgment and
Competitive Impact
Statement are available
for inspection at the
Department of Justice,
Antitrust Division,
Antitrust Documents Group,
325 7th Street, N.W., Room
215, Washington, DC 20530
(telephone: 202-514-2481),
on the Department of
Justice's website
(www.usdoj.gov/atr), and
at the Office of the Clerk
of the United States
District Court for the
District of Columbia.
Interested persons may
address comments to John
Read, Chief, Litigation
III Section, Antitrust
Division, Department of
Justice, Washington, DC
20530 (telephone: 202-307-
0462), within 60 days of
the date of this notice.

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
|     ) | |
|     ) | |
|     ) | |
| *Plaintiff,*     ) | Civil Action No. 1:08-cv-00245 |
|     ) | |
| v.     ) | |
|     ) | |
|     ) | |
| BAIN CAPITAL, LLC     ) | |
|     ) | |
| and     ) | |
|     ) | |
| THOMAS H. LEE PARTNERS, L.P.     ) | |
|     ) | |
| and     ) | |
|     ) | |
| CLEAR CHANNEL COMMUNICATIONS, INC.   ) | |
|     ) | |
| *Defendants.*     ) | |
|     ) | |
|     ) | |

**DESCRIPTION OF WRITTEN OR ORAL COMMUNICATIONS**
**CONCERNING THE PROPOSED FINAL JUDGMENT IN THIS ACTION**
**AND CERTIFICATION OF COMPLIANCE UNDER 15 U.S.C. § 16(g)**
**BY BAIN CAPITAL, LLC AND THOMAS H. LEE PARTNERS, L.P.**

Pursuant to Section 2(g) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(g),

defendants Bain Capital, LLC and Thomas H. Lee Partners, L.P., ("Bain Capital" and "TH Lee"),

by their attorneys, submits this pleading to describe all written or oral communications by or on

behalf of Bain Capital and TH Lee with any officer or employee of the United States concerning

the proposed Final Judgment filed in this action on February 13, 2008. In accordance with

Section 2(g), this description excludes any communications "made by counsel of record alone

1

with the Attorney General or the employees of the Department of Justice alone." 15 U.S.C. §
16(g).

   To the best of Bain Capital and TH Lee's knowledge, after appropriate inquiry, we have
been able to identify only one instance where representatives of TH Lee met directly with
employees of the Department of Justice. That meeting, which occurred at the Justice
Department's offices at 325 Seventh Street, NW, Washington, DC on September 13, 2007, was
convened at the request of TH Lee and Bain Capital to discuss restrictions proposed by the staff
that would limit the ability of directors in the acquired company to serve as directors or board
observers to other broadcasting entities. James Carlisle and Richard Bressler attended and
participated in the meeting in behalf of TH Lee. Attendees from the Department of Justice
included Ora Nwabueze, John R. Read, Christopher Ries and other representatives of the
Department of Justice. Representatives of the parties included James M. ("Mit") Spears of
Ropes & Gray, LLP and Hew Pate of Hunton & Williams LLP representing Bain Capital and TH
Lee.

   Apart from that meeting, there have been no written or oral communications by or on
behalf of Bain Capital or TH Lee with any officer or employee of the United States concerning
the proposed Final Judgment, except for communications between counsel of record for Bain
Capital and TH Lee and employees of the Department of Justice Antitrust Division. Clear
Channel therefore certifies that the requirements of Section 2(g) have been complied with and
that this description of communications by or on behalf of Bain Capital and TH Lee and required
to be reported under Section 2(g) is true and complete.

June 20, 2008

Respectfully submitted,


/s/ Amy E. Craig
Amy E. Craig
(D.C. Bar No. 976901)
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4736
Counsel for Bain Capital, LLC and Thomas H. Lee
Partners, L.P.



James M. Spears
(D.C. Bar No. 428958)
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4681
Counsel for Bain Capital, LLC and Thomas H. Lee
Partners, L.P.

3

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2008, I caused a copy of the foregoing **Description of Written or Oral Communications Concerning the Proposed Final Judgment in this Action and Certification of Compliance Under 15 U.S.C. § 16(g) by Bain Capital, LLC and Thomas H. Lee Partners, L.P.** to be served on the counsel of record in this matter in the manner set forth below:

Electronically by means of the Court's ECF system and by Federal Express:

Daniel McCuaig
United States Department of Justice
Antitrust Division, Litigation III Section
325 Seventh Street, N.W., Suite 300
Washington, DC 20530
Telephone: (202) 307-0520
Facsimile: (202) 514-7308
Email: daniel.mccuaig@usdoj.gov


Phillip A. Proger
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-4668
Facsimile: (202) 626-1700
Email: paproger@jonesday.com



/s/ Amy E. Craig
Amy E. Craig
(D.C. Bar No. 976901)
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005
(202) 508-4736
Counsel for Bain Capital, LLC and Thomas H. Lee
Partners, L.P.

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| *Plaintiff,* ) | Civil Action No. 1:08-cv-00245 |
| ) | |
| v. ) | Filed: Feb. 13, 2008 |
| ) | |
| ) | Judge: Robertson, James |
| BAIN CAPITAL, LLC ) | |
| ) | Description: Antitrust |
| and ) | |
| ) | |
| THOMAS H. LEE PARTNERS, L.P. ) | |
| ) | |
| and ) | |
| ) | |
| CLEAR CHANNEL COMMUNICATIONS, INC. ) | |
| ) | |
| *Defendants.* ) | |
| ) | |
| ) | |

## DESCRIPTION OF WRITTEN OR ORAL COMMUNICATIONS CONCERNING THE PROPOSED FINAL JUDGMENT IN THIS ACTION AND CERTIFICATION OF COMPLIANCE UNDER 15 U.S.C. § 16(g) BY CLEAR CHANNEL COMMUNICATIONS, INC.

Pursuant to Section 2(g) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(g), defendant Clear Channel Communications, Inc. ("Clear Channel"), by its attorneys, submits this pleading to describe all written or oral communications by or on behalf of Clear Channel with any officer or employee of the United States concerning the proposed Final Judgment filed in this action on February 13, 2008. In accordance with Section 2(g), this description excludes any communications "made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone." 15 U.S.C. § 16(g).

To the best of Clear Channel's knowledge, after appropriate inquiry, there have been no written or oral communications by or on behalf of Clear Channel with any officer or employee of

the United States concerning the proposed Final Judgment, except for communications between counsel of record for Clear Channel and employees of the Department of Justice Antitrust Division. Clear Channel therefore certifies that the requirements of Section 2(g) have been complied with and that this description of communications by or on behalf of Clear Channel and required to be reported under Section 2(g) is true and complete.

Respectfully submitted,

/s/ Phillip A. Proger

Phillip A. Proger
(D.C. Bar No. # 929596)
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-4668
Counsel for Clear Channel Communications, Inc.

July 1, 2008

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Defendant's Description of Written or Oral Communications Concerning The Proposed Final Judgment in This Action And Certification of Compliance Under 15 U.S.C. § 16(g) and Notice of Appearance were served electronically by means of the Court's ECF system and by first-class mail this 1st day of July 2008 upon each of the parties listed below:

> Daniel McCuaig, Esq.
> Antitrust Division
> Litigation III Section
> U.S. Department of Justice
> 450 5th St., NW
> Washington, DC 20530
> Counsel for United States of America
> Telephone: (202) 307-0520
> Facsimile: (202) 514-7308
> Email: daniel.mccuaig@usdoj.gov

> James M. "Mit" Spears, Esq.
> Amy E. Craig, Esq.
> Ropes & Gray, LLP
> One Metro Center
> 700 12th Street, NW, Suite 900
> Washington, DC 20005
> Counsel for Bain Capital, LLC and Thomas H. Lee Partners, L.P.
> Telephone: (202) 508-4681
> Facsimile: (202) 383-8320
> Email: mit.spears@ropesgray.com
>         amy.craig@ropesgray.com

> /s/ Phillip A. Proger
> Phillip A. Proger
> (D.C. Bar No. # 929596)
> Jones Day
> 51 Louisiana Avenue, N.W.
> Washington, DC 20001
> (202) 879-4668
> Counsel for Clear Channel Communications, Inc.